STATE OF NEBRASKA, APPELLEE, V. TIMOTHY PIERCE, APPELLANT.

527 N.W.2d 872

Filed February 14, 1995.   No. A-94-398.

Leonard G. Tabor for appellant.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

SIEVERS, Chief Judge, and HANNON and MUES, Judges.

SIEVERS, Chief Judge.

The conviction of Timothy Pierce on appeal here is premised solely upon circumstantial evidence. Consequently, we must

utilize the Nebraska Supreme Court's recent pronouncements on the subject of the standard of appellate review from *State v. Skalberg*, 247 Neb. 150, 526 N.W.2d 67 (1995).

Pierce was convicted by a Scotts Bluff County District Court jury of forcibly breaking and entering the home of Julie Pengelly, with the intent to commit a felony or steal property, in violation of Neb. Rev. Stat. § 28-507(1) (Reissue 1989). After an enhancement hearing, Pierce was found to be a habitual criminal as defined in Neb. Rev. Stat. § 29-2221 (Reissue 1989), and he was sentenced to an indeterminate term of 14 to 17 years' imprisonment. For the reasons cited below, we reverse the conviction.

## FACTUAL BACKGROUND

Julie Pengelly resided alone in a house at a lakeside development comprising 30 to 35 homes at Lake Minatare located in Scotts Bluff County. On the evening of August 24, 1993, she worked in her home at tasks associated with her position as the volleyball coach at Scottsbluff High School. She retired at approximately 10:15 p.m. and awoke a minute or two before 1:49 a.m. to find a man with his hand or hands upon her shoulder. She screamed, called him a "son of a bitch," pulled her knees up to her chest, and kicked hard against his chest, propelling him across the room, where he hit a wall and fell into a chair. Pengelly immediately ran out of her home to a neighbor's, where a call was placed to 911 which was received at 1:49 a.m. Within 7 minutes, Deputy Scotts Bluff County Sheriff Vern Hessler and a Minatare police officer arrived and began an investigation of the incident.

Although there had been no interior lights on at the residence, Pengelly described the man to Hessler as a

> white male suspect, 5'6" tall, average, indicating not muscular build, late 20's to early 30's in age, dishwater blond hair, ear lobe length parted down the middle. She said he had no mustache or beard, no chest hair, no alcohol on his breath, she said he was wearing no shirt or cap, and she was unaware if he had anything below — on below the waist, she didn't observe that.

Pengelly had run from her home using the door on the road

side of the home, but had noticed as she passed that the other door, on the lake side of the home, was closed. During the inspection of the residence in the course of the investigation, the door on the lake side was found to be open. A nearly floor-to-ceiling window screen had been removed and had been set inside the residence. Pengelly had gone to bed with this window open, but with the screen in place. The key piece of physical evidence was a Miller Genuine Draft beer bottle found by Hessler and Pengelly sitting on the ground outside of the home in front of the window where the screen had been removed. The bottle was found as Pengelly and Hessler examined the area within a matter of minutes of the occurrence. Pengelly described the bottle, when it was first discovered, as "obviously fresh, there was foam in it," and she said that the ground was wet and cold where the contents of the bottle had spilled. Pengelly and Hessler left the beer bottle where it was, but later that morning at approximately 10:30 when Pengelly returned from her volleyball practice, she decided that the beer bottle may be important. Pengelly testified that she picked the bottle up with a pencil inside the neck of the bottle; poured out the remaining beer, observing foam when it hit the ground; and took it inside. On the afternoon of August 25, this beer bottle was taken by Alex Moreno, a sheriff's investigator, who checked it for latent fingerprints. Three prints were found on the bottle, one of which was read by Linda Brokofsky, a fingerprint expert with the Nebraska State Patrol, as being a match with the right ring finger of Pierce. Moreno dusted several areas in the residence for fingerprints, including the window screen and the doorknob on the lake side door which was standing open when Pengelly and Hessler returned to the residence and examined it after the incident. However, no fingerprints or smudges were found.

Hessler found a knife (described variously in the record as a utility and a paring knife), in the yard on the road side of the residence. However, Pengelly did not testify that the man who stood over her bed displayed any weapon. A search of the home where Pierce lived, the third home west of Pengelly's, did not turn up a similar set of knives or any other matching set of knives with one missing which would account for the knife

found in Pengelly's yard. No fingerprints or smudges were found on the knife.

Pengelly testified that when she fled her house, she was being chased and barked at by a dog named "Bear" which she recognized as belonging to Pierce. The evidence established that Bear was a German shepherd-Chow cross which had the physical appearance of a Rottweiler. The evidence also established that Pierce's sister, Tamara Miller, who lived with Pierce, owned a purebred Rottweiler named "Sammi Jo." Various witnesses throughout the trial related that there were typically 8 to 10 free-roaming dogs in the area, plus an occasional stray or two. Katherine Pierce, formerly Katherine Carmodie, who then lived with Pierce and his sister, testified that although Bear was often chained in the daytime, the dog was allowed to run loose at night.

When Hessler arrived in the area in response to the call, the only lights on in any residence in the area were at Bonnie Wickard's, where Pengelly had run to make the 911 call. Pierce was contacted about 3:15 on the morning of the incident after Pengelly told Hessler that "the neighbor man down the road might match the description." Hessler testified that when he first saw Pierce, he appeared as though he had just woken up, he was wearing just blue jeans, and "[h]e did have chest hair, he did have a mustache and beard." In his deposition used at trial for impeachment, Hessler testified that Pierce had said he had been asleep at the residence for several hours. When Hessler drove up to the Miller-Pierce residence at about 3:15 a.m. he observed two dogs running loose and barking at him. Hessler testified that it took a long time to rouse someone to come to the door. Hessler testified that while inside the Miller-Pierce residence, he saw Miller Genuine Draft beer, in cans, and that Pierce admitted to him that this was the brand he drank.

On the evening prior to this incident, a group of people were having a party on the beach approximately 550 feet from Pengelly's home, and included in this group were Edward Gonzales, Juanita Martinez, Cenovio Gonzales, and Lori Gonzales, all of whom testified for the State. None of these witnesses testified to seeing Pierce enter Pengelly's residence. They did testify that Pierce spent time with them that evening at

that party drinking beer.

Edward Gonzales testified that he first saw Pierce around 8:30 to 9 p.m. when he came to their beach campsite with one dog following him, but looking for another one. Pierce was directed down the beach to another campsite, and he later returned with the Rottweiler-looking dog. Juanita Martinez was with Art Rivera that evening. She testified that this party was the first time she had seen Pierce, and her recollection of seeing Pierce for the first time was when he walked up to their campsite party with "the dogs" and started "talking to the guys there." She testified that they were running low on beer, and Rivera and Pierce left and came right back with "tall beer" which had Harley-Davidson logos on the cans. Edward testified that Pierce returned from this "beer run" with Rivera with cans of Miller Genuine Draft beer with Harley-Davidson logos on them. During Moreno's search of the beach area the next day, he found empty cans like these. Edward testified that when Pierce returned with the Harley Davidson cans, Pierce was drinking from an open bottle of beer of an unspecified brand. Martinez placed the time of this "beer run" at 8:30 to 9 p.m., and no other evidence introduced has Pierce drinking from a beer bottle at any other time except upon the return from this "beer run."

Martinez testified that Pierce left the party a second time with herself and Rivera in her car. Martinez testified that Pierce had them stop along the beach and that Pierce indicated that he would be back in 5 minutes, but that he never returned to the vehicle. At the spot where they let Pierce out on the beach, Martinez could see up the hill toward the houses, and she described this as being around 11 or 11:30 p.m.

Cenovio Gonzales testified that he first saw Pierce at Gilligan's, a lakeside store that sells beer, that evening around 8:30 or 9, when Cenovio had stopped to get beer. Cenovio invited Pierce to the beach party. Pierce showed up at the party, and Cenovio described him as "walk[ing] through the trees and some dogs follow[ing] him." Cenovio testified that Pierce left the party for 10 to 15 minutes, came back, and then left a second time with Rivera and Martinez, but Pierce did not come back after the second time. Cenovio testified that when Pierce

left the first time, Pierce brought back big Miller cans with Harley-Davidson pictures on the back of them, but that at Gilligan's, Pierce had been drinking Miller beer from bottles. Cenovio testified that "when [Pierce] left the second time he said he was going home because everybody else was going to sleep." Cenovio described being at the party during the day and seeing the Rottweiler-looking dog running around and said that evening when Pierce came, there were four or five other dogs. Cenovio said that Pierce had obviously been drinking, as had the other males at the party.

Lori Gonzales testified that she recalled seeing Pierce at the party and recalled him leaving with Rivera to get some beer and that they returned with beer. On a second occasion, Pierce left with Rivera and Martinez to look for firewood. Lori testified that on this occasion, "he took the dogs with him. . . . [T]hey jumped in the back of [Martinez'] hatchback." Martinez and Rivera came back without Pierce, saying that he was taking too long and that they had to leave because Martinez had to go to work the next day. Pierce then returned, apparently at a time when only four people were left at the party: Lori and Edward Gonzales, Jessica Gomez, and Cenovio Gonzales. Lori testified that Pierce came back without the dogs, but that they showed up later on because "wherever he was the dogs seemed to come around." The only testimony from Lori about Pierce's drinking was that he was drinking a "can of — it was gold with [a] black label."

Edward Gonzales' direct testimony was that Pierce left the party site for the last time around 2 a.m. Edward also testified that when Pierce returned on foot after Rivera and Martinez had left, the two dogs were with him. According to Edward, the dogs were also sniffing around the tent when he woke up in the morning, even though Pierce was not there. On cross-examination, Edward was confronted with his deposition testimony where he had testified that he " 'was already inside the tent with Lori and I didn't know when he [Pierce] had left, I didn't know, I have no recall of when he left.' "

Reynaldo "Ray" Ramirez testified that he was the manager of Gilligan's on August 24 and 25, that he was familiar with the neighborhood, and that there were 8 or 10 dogs in the

neighborhood, including a large black dog that came and went. Ramirez further testified that in the summer of 1993 Pierce worked part time at odd jobs at Gilligan's including stocking the beer coolers. On weekends, this might mean stocking three or four times per day, which also included breaking down larger containers such as 6- or 12-packs to stock the "singles." During the week, the coolers were usually stocked once a day in the evening. Of the Miller brands, Ramirez said that Genuine Draft in bottles was the top seller. Ramirez testified that Pierce had worked August 24.

Tamara Miller, Pierce's sister and Ramirez' girl friend, testified that there were always stray dogs in this area. She also corroborated Ramirez' testimony that Pierce stocked the coolers at Gilligan's, including the day before the crime. Miller testified that she and Ramirez had driven Pierce home from Gilligan's that evening shortly after 10:30. That evening, Miller's children were being babysat by Pierce's girl friend, Katherine Carmodie (now Katherine Pierce). Miller testified that she had called Katherine to check on her children several times during the evening, including a call around 12:30 a.m. Katherine testified that after that phone call, she and Pierce went to bed and did not get up until Hessler arrived around 3:15 a.m. Katherine also testified that when Pierce came home that evening around 10:30 she could smell smoke and alcohol on him.

## ASSIGNMENTS OF ERROR

Pierce assigns error by the trial court in the following particulars: (1) the failure to sustain his motion for a directed verdict at the close of the evidence; (2) that the evidence was insufficient as a matter of law to sustain a finding of guilt; (3) the failure of the State to prove all of the essential elements of the crime; (4) the admission over objection of exhibits 8, 18, and 12 through 16; (5) the failure to grant a motion for new trial; and (6) the imposition of an excessive sentence.

## STANDARD OF REVIEW

Because this is a circumstantial evidence case, we are bound to apply the standard of review found in the Nebraska Supreme Court's recent decision *State v. Skalberg*, 247 Neb. 150, 526

N.W.2d 67 (1995).

In *Skalberg*, the Nebraska Supreme Court held that when circumstantial evidence is the only basis upon which to support a conviction, there are two initial questions of law to be determined by the trial court prior to the submission of the evidence to the trier of fact. These questions are whether the circumstantial evidence is reasonably susceptible of two interpretations, one of guilt and the other of nonguilt, and if so, whether the inference of guilt is stronger than the inference of nonguilt. *Skalberg* then holds that if the inference of nonguilt "is stronger than or equal to the inference of guilt, then the case should not be submitted to the trier of fact." *Id.* at 156, 526 N.W.2d at 71.

*Skalberg* also addresses the question of the standard of review for the appellate court and holds:

> [T]he appellate court must first *independently decide as a matter of law* whether the circumstantial evidence is reasonably susceptible of two interpretations and whether the inference of nonguilt is stronger than or equal to the inference of guilt. Regarding a question of law, an appellate court has an obligation to reach a conclusion independent of that of the trial court in a judgment under review.

(Emphasis supplied.) *Id.* at 156, 526 N.W.2d at 71. If, after our independent review, we determine that the evidence was properly submitted to the trier of fact, "then on appeal the State is entitled to have all conflicting evidence and the reasonable inferences which can be drawn from the evidence viewed in its favor." *Id.* at 157, 526 N.W.2d at 71.

*Skalberg* also contains the following passage:

> In *Covarrubias*, 244 Neb. at 374, 507 N.W.2d at 253, we explained our earlier holding in *State v. LaFreniere*, 240 Neb. 258, 481 N.W.2d 412 (1992): "*LaFreniere* holds that in determining the sufficiency of circumstantial evidence to support a conviction, any fact or circumstance reasonably susceptible of two interpretations must be resolved most favorably to the accused. *LaFreniere* requires a reasonable inference from circumstantial evidence to be taken most favorably to the accused when

circumstantial evidence is the only basis upon which to support a conviction and the circumstantial evidence is reasonably susceptible of two interpretations, one of guilt and the other of nonguilt, and neither inference is stronger than the other. See, also, *State v. Ruiz*, 241 Neb. 693, 489 N.W.2d 865 (1992); *State v. Dawson*, 240 Neb. 89, 480 N.W.2d 700 (1992)."

`State v. Skalberg*, 247 Neb. at 156, 526 N.W.2d at 71.

Thus, in a jury trial there are three possible combination in a solely circumstantial evidence case where the evidence is reasonably susceptible of two interpretations: (1) The inference of guilt is stronger than that of nonguilt, in which instance the matter is properly submitted to the fact finder, and upon appellate review of the conviction the State is entitled to have the evidence and the inferences drawn therefrom viewed in its favor; (2) the inference of nonguilt is stronger than that of guilt, in which instance the case should not be submitted to the jury; or (3) the inferences of guilt and nonguilt are equal, in which event the case also should not be submitted to the jury. In the latter two instances, when the case should not be submitted to the fact finder, the evidence will be deemed insufficient to sustain the conviction. We read *Skalberg* as saying that the appellate courts are to weigh the inferences and judge their relative strength in order to reach an independent conclusion, as a matter of law, as to where the case falls among the three possibilities outlined herein.

## ANALYSIS

We take it as established that at some point in time Pierce touched, handled, or held the beer bottle found outside Pengelly's window through which entry was made. The proposition is well established that "[f]ingerprint identity testified to by a qualified expert is perhaps the best known method of the highest probative value in establishing identification." *State v. Riley*, 182 Neb. 300, 303, 154 N.W.2d 741, 743 (1967). Although much is now said and written about DNA evidence, see *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994), we believe the statement from *Riley* still retains its vitality. However, the question is whether Pierce's fingerprint

on the beer bottle is sufficient to sustain the conviction, since the inferences from the other circumstantial evidence in this case are equivocal.

We face a question which has not previously been addressed by the Nebraska courts. That question is whether the evidence should be submitted to the jury and whether the evidence is sufficient to sustain a conviction when (1) all evidence of guilt is circumstantial, (2) the principal piece of evidence is the defendant's fingerprint impressed upon a movable object found outside of the illegally entered residence, and (3) the State's evidence fails to establish that the defendant's access to the object was limited so that his print could only have been impressed on the object during the commission of the crime.

As there is no Nebraska case on point, we turn to other jurisdictions and begin with the opinion, from which much of the precedent on this subject seems to have been derived, *Borum v. United States*, 380 F.2d 595 (D.C. Cir. 1967). Borum was convicted of housebreaking. The victim's home was entered and ransacked in his absence between 11:45 a.m. and 3 p.m., and four fingerprints taken from empty jars were identified as Borum's. The victim testified that the jars had contained a valuable coin collection which was stolen along with other items of personal property. The government's evidence also placed Borum within 1½ miles of the victim's home at approximately 1 p.m. on the day of the break-in.

In footnotes, the circuit court in *Borum* cited testimony that the fingerprint expert could not tell whether Borum's fingerprints were " 'recent prints or old prints,' " *id*. at 597 n.9, and found it noteworthy that Borum's prints were not found anywhere else in the house, although it had been "forcibly entered and thoroughly ransacked." *Id*. at 597 n.8. The court reasoned that there was no evidence, "either direct or circumstantial, which indicates that he [Borum] touched the jars in the course of a housebreaking on June 2, 1965." (Emphasis omitted.) *Id*. at 596. The court acknowledged that the jury may have thought that Borum could not have touched the jars at any other time or in any other place except during the housebreaking, but that such a conclusion would be based on speculation alone. The failure of the government to introduce

evidence that the jars were inaccessible to Borum except during the course of the housebreaking resulted in reversal of the conviction. The court reasoned:

> The jury had no way to determine where the complainant purchased the jars, or how long he had them before June 2, or whether complainant ever removed them from his home, or how long the prints were on the jars. The Government need not negate all inferences consistent with innocence which could arise from the fingerprints. It negated none.
>
> With evidence so inconclusive, a reasonable person must have a reasonable doubt about Borum's guilt. The case should not have been submitted to the jury, for the Government produced no evidence, either direct or circumstantial, which could support an inference that the fingerprints were placed on the jars during commission of the crime. Fingerprint evidence is very reliable. It is a kind of evidence courts should encourage police to obtain. But to allow this conviction to stand would be to hold that anyone who touches anything which is found later at the scene of a crime may be convicted, provided he was within a mile and a half of the scene when the crime may have been committed. We decline to adopt such a rule.

(Emphasis omitted.) *Id*. at 597.

It seems to us that *Borum* is very close to the instant case. There were no other prints found inside the Pengelly residence, despite Moreno's thorough examination of places that the intruder was likely to have touched during the course of the crime. However, two other prints described as unsuitable for comparison were found on the beer bottle, allowing one to at least speculate that someone else had also handled the bottle. The fingerprint expert who testified in this case also admitted that depending on the oiliness of the skin, temperature, moisture on the object, and humidity, it was possible to touch an object and not leave fingerprints.

The evidence which supports the conclusion that the bottle had recently been placed where it was found outside of Pengelly's residence is that Pengelly said the beer in the bottle still had visible foam, and the ground was wet and cold where

beer had spilled. However, that by itself does not compel the conclusion that the bottle had been placed there by Pierce, or if he placed it there, that he then entered the residence. Hessler, who found the bottle with Pengelly, testified that he did not take the bottle because, given "the proximity of the house from the lake, it could have been dropped there from anyone that may have walked across the yard." Moreover, even recent placement of the bottle does not establish when Pierce's fingerprint was impressed thereupon, particularly when the undisputed evidence is that Pierce is the beer stocker at the neighborhood off-sale location. Moreover, there was no expert testimony as to whether this was an old or new fingerprint. Thus, on the accessibility question, the evidence fails to limit Pierce's access to the beer bottle to the time of the crime, which is deemed essential under the line of authority beginning with *Borum*.

■ Citing *Borum*, the Fourth Circuit Court of Appeals has said that the probative value of an accused's fingerprints upon a readily movable object is highly questionable, unless it can be shown that such prints could have been impressed only during the commission of the crime. *United States v. Corso*, 439 F.2d 956 (4th Cir. 1971). In *Corso*, a burglary conviction was reversed where the trial court had charged the jurors that if they found that the fingerprints on a matchbook cover (which had been placed in the door lock to prevent the door from locking) were those of the defendant, then they must conclude that he was the one who put the cover in the lock at the time of the burglary. Although the fingerprint expert's testimony was that Corso's prints were on the matchbook cover, there was no evidence as to how or when they were impressed thereupon. Furthermore, this expert admitted that the prints could have been on the matchbook cover for months.

The doctrine was further refined in *United States v. Van Fossen*, 460 F.2d 38 (4th Cir. 1972), which involved the reversal of convictions for possession of engraving plates with intent to use them to counterfeit federal reserve notes and for printing and photographing likenesses of the notes. The convictions were based solely on the presence of Van Fossen's fingerprints on a plate and on two negatives, one of which had been used in the counterfeiting. The seizure of these items occurred when

Brown's Business Forms, a printing shop, was raided by federal agents, resulting in the arrest and conviction for counterfeiting of Roger Leo Brown. Other than the fingerprints, there was no evidence which connected Van Fossen to Brown or to the counterfeiting operation uncovered in Brown's printing shop. Relying upon *Corso* and *Borum*, the court held:

> Read together, these cases illustrate a well established rule concerning the sufficiency of fingerprint evidence. To warrant conviction the trier of fact must be able to reasonably infer from the circumstances that the fingerprints were impressed at the time the crime was committed. *See* State v. Smith, 274 N.C. 159, 161 S.E.2d 449, 452 (1968); 3 Wharton's Criminal Evidence § 982 (12th ed. 1955, Supp.1971); Annot. 28 A.L.R.2d 1115, 1150 (1953).

*United States v. Van Fossen*, 460 F.2d at 40-41. The court detailed a number of gaps in the government's case as to when and how Van Fossen's prints came to be on the items, noting that Brown also ran a legitimate printing shop and that the evidence did not show that the items were unavailable to a person in the shop on legitimate business. Nor did the evidence show any knowledge on the part of Van Fossen that the items which had his prints were known by him to be contraband. The court reversed the convictions, concluding that such gaps could only be filled by speculation, which was insufficient to sustain the convictions.

In *Mikes v. Borg*, 947 F.2d 353 (9th Cir. 1991), *cert. denied* 502 U.S. 1229, 112 S. Ct. 3055, 120 L. Ed. 2d 921 (1992), a first degree murder conviction was overturned on a federal habeas corpus proceeding where the only fact connecting the defendant, Mikes, to the murder was the presence of Mikes' fingerprints on three pieces of a disassembled turnstile unit, a piece of which was used to bludgeon the victim to death during the course of a burglary. There was no evidence placing Mikes at the scene of the crime, either on the day of the murder or on any other occasion, nor were any of the stolen items found in Mikes' possession. Additionally, none of Mikes' fingerprints were found on any other items that were clearly handled by the burglar in the course of the crime.

Citing undisputed defense evidence that fingerprints may last indefinitely, the *Mikes* court examined the custody, location, and function of the turnstile posts to determine if Mikes' prints could have been impressed thereon before the victim's purchase of the turnstile, at a hardware store's going-out-of-business sale approximately 4 months before the murder, and remained intact thereon until the time of the murder. The court concluded that the fingerprints in question could have been impressed by one disassembling the turnstile, by one who sold the turnstile to the victim, or by one who considered buying (and handled) the turnstile prior to the victim's acquisition. Although conceding that it was less likely, the court also concluded that the fingerprints could have been impressed on the last occasion when the turnstile was in general public use. We do note that in contrast to the instant case, there was no evidence that Mikes had ever done any of these things concerning the turnstile, much less that he had been in a position to do so. Nonetheless, the Ninth Circuit held in *Mikes*:

> In order to support a finding that Mikes is guilty beyond a reasonable doubt, the record must demonstrate that he in fact touched the posts at the time the crime was committed and not at some earlier point. Under our judicial system, the defendant has no duty to explain the presence of his fingerprints. *Borum*, 380 F.2d at 597 n. 11. Likewise, he is under no obligation to illuminate any inferences from the fingerprint evidence that are consistent with his innocence. To put it more directly, the defendant need not explain how or when his fingerprints were placed on the object in question; that burden lies elsewhere. *Id.* at 597. On the basis of the record before us, a reasonable factfinder could not conclude beyond a reasonable doubt that Mikes' fingerprints were placed on the turnstile posts at the time of the commission of the crime. There is insufficient evidence to warrant that conclusion rather than the conclusion that the fingerprints were impressed on the posts at an earlier time. There is, in short, a total failure of proof on the "accessibility" question.

947 F.2d at 359.

■ The law appears quite well established that in a solely circumstantial evidence case, fingerprint evidence is sufficient to sustain a conviction only if the record contains sufficient evidence from which the trier of fact can reasonably infer that the defendant's fingerprints were in fact impressed on the object in question while he was committing the crime and not at some other time. See cases collected at Annot., 28 A.L.R.2d 1154 et seq. (1953), and Annot., 28-31 A.L.R.2d Later Case Service 1115-1158 § 29 at 140 et seq. (1981). We set forth further examples of the doctrine: *United States v. Collon*, 426 F.2d 939 (6th Cir. 1970) (robbery conviction was reversed where a defendant's fingerprints and palm prints were found on a roadmap in the getaway car, without evidence of the age of the prints; the prints were said to be insufficient to place him in the automobile at the scene of the crime); *Ladd v. State*, 363 So. 2d 1017 (Ala. Crim. App. 1978) (defendant's conviction for buying, receiving, or concealing a stolen automobile was reversed where the only evidence linking him to the car was his fingerprints on a rearview mirror; the court reasoned that fingerprints prove identity and presence, which alone is insufficient circumstantial evidence to prove the defendant's guilt beyond a reasonable doubt); *Wilkerson v. State*, 232 So. 2d 217, 219 (Fla. App. 1970) (breaking and entering conviction was reversed where only evidence against defendant was his fingerprint on a fragment of broken glass from a broken front door of a clothing store said by the court to be "certainly a place readily accessible to the general public"); *Gray v. State*, 4 Md. App. 155, 241 A.2d 725 (1968), *vacated on other grounds*, 254 Md. 385, 255 A.2d 5 (1969) (robbery conviction was reversed where only evidence was defendant's fingerprints in getaway car, a rental car, where the evidence was that defendant had been legitimately in the car for a ride with an employee of National Car Rental some 2 weeks earlier); *State v. Gilliam*, 245 S.C. 311, 140 S.E.2d 480 (1965) (defendant's fingerprint on a fragment of a broken pane of glass found outside building was insufficient to sustain the conviction); *People v. Rhodes*, 85 Ill. 2d 241, 249, 422 N.E.2d 605, 608 (1981) (the Illinois Supreme Court reviewed a series of cases from the Illinois Appellate Court involving convictions resting principally on fingerprint

evidence and held that in order to sustain a conviction solely on such evidence, "fingerprints corresponding to the fingerprints of the defendant must have been found in the immediate vicinity of the crime under such circumstances as to establish beyond a reasonable doubt that the fingerprints were impressed at the time the crime was committed").

*People v Himmelein*, 177 Mich. App. 365, 442 N.W.2d 667 (1989), *cert. denied* 498 U.S. 1096, 111 S. Ct. 985, 112 L. Ed. 2d 1070 (1991), is a case which serves to demonstrate how fingerprint evidence, together with limiting evidence on the accessibility of the movable object, is sufficient to sustain a conviction. The *Himmelein* court upheld convictions for criminal sexual conduct, unarmed robbery, and unlawful driving based solely on a fingerprint, although acknowledging that "[t]he general rule is that fingerprint evidence alone is sufficient to establish identity if the prints are found at the scene of the crime under such circumstances that they could have only been made at the time of the commission of the crime." 177 Mich. App. at 374-75, 442 N.W.2d at 672. The defendant's fingerprint, the only incriminating evidence, was on a yardstick with which the victim had been struck during the attack. The defendant, an acquaintance of the victim's husband, had been in the house on one occasion 18 months prior to the attack and had had no more recent opportunity for access to the yardstick. An expert testified that latent fingerprints were fragile and would not survive constant handling of the object by others.

In *United States v. Harris*, 530 F.2d 576 (4th Cir. 1976), the court made it clear that the doctrine of *United States v. Corso*, 439 F.2d 956 (4th Cir. 1971), would not apply where there was other evidence to sustain the conviction. In *Harris*, although the fingerprint evidence suffered from the same sort of deficiencies as in the other cases we have detailed, Harris had provided a detailed confession which, although recanted, was sufficient to sustain the conviction. In the instant case, we have searched the record for some other evidence to bolster the fingerprint evidence, as in *Harris*. We turn to the physical description of the intruder given to Hessler immediately after the crime and compare it to Hessler's own observation of Pierce's appearance when he was roused from bed by Hessler at 3:15 a.m.

Although Pengelly's description of height and weight matched Pierce, she told Hessler that the intruder had no beard or mustache, that he was bare chested and did not have chest hair—she placed her bare feet on his bare chest and pushed him across the room—and that she smelled no alcohol. When Hessler saw a just-awakened Pierce, he saw a man clad in jeans who had a beard and mustache and a hairy chest. The evidence was also abundant that Pierce had been drinking the entire evening. This evidence of the intruder's appearance does not make this case into a *Harris*-type exception to the doctrine of *Borum v. United States*, 380 F.2d 595 (D.C. Cir. 1967), because it tends to exclude rather than implicate Pierce as the intruder.

In the case at hand, the undisputed evidence establishes that Miller Genuine Draft in bottles is the best selling Miller beer at Gilligan's, the neighboring lakeside bar and off-sale location. Miller beer bottles are common at this lakeside recreation area, and a good number of them may well have Pierce's fingerprints impressed thereon. Pierce, the beer stocker at Gilligan's, handles the beer sold there, including the singles. The fact that he handled this beer bottle as evidenced by his fingerprint thereupon does not allow one to make a choice, with any degree of certainty based on logic and reason, between whether he touched the bottle at some time prior to the time of the break-in, whether he was handling the beer bottle outside of Pengelly's window prior to breaking in, whether he was outside the window but did not enter the residence, or whether the intruder had purchased or acquired a beer stocked by Pierce at Gilligan's. After our independent review of the inferences in this solely circumstantial evidence case, we conclude that Pierce's fingerprint on the beer bottle found *outside* of Pengelly's residence, without more, is insufficient to sustain the conviction.

We now look to the other evidence to see if the fingerprint stands alone or whether it is bolstered by other evidence as in *Harris*. The State appears to rely upon, along with the beer bottle, three other items of evidence to sustain the conviction. The first is Pengelly's testimony that she was chased by Pierce's dog as she fled her residence. The State's apparent conclusion, and perhaps the jury's, is that Pierce's dog would not have been

by Pengelly's home in a position to chase Pengelly if Pierce also were not there. This attributes a characteristic to the dog which is not sustained by the evidence, to wit: that the dog and Pierce were *always* in the same place. The evidence is different. The evidence is that the dog was allowed to run loose at night. Edward Gonzales testified that during this evening Pierce was looking for his dog when he came to the party, thereby establishing that Pierce and his dog were not always together. Hessler observed two loose dogs that evening when he arrived at Pierce's home to talk to him. Additionally, Pengelly's home was only three homesites east of Pierce's home. We do not believe it can be said that Pierce was in Pengelly's residence because his dog may have been located close thereby when Pengelly fled from it. There is no evidence to establish that the dog's behavior was predictable to this degree.

The next piece of evidence is simply that Pierce was "out and about" that evening at the beach party occurring within 200 yards of Pengelly's residence and that he may have been up as late as 2 a.m. The most that can be said about this evidence is that Pierce was in close proximity to the crime, but so were the other people who live in this lakeside development, as well as the partygoers, and we observe that there was testimony of another party that evening in the area besides the one attended by Pierce. Additionally, Pierce had a reason to be in the area, since he lived there.

Finally, Pierce had been observed drinking beer from a bottle while at the beach party on one occasion, but the brand was not identified. However, taking the evidence of the partygoers together, it appears that the only evidence of when this occurred was from Martinez, and her testimony would have placed this observation of him consuming beer from a bottle in the neighborhood of 8:30 to 9 p.m. Other than this testimony, there was no evidence of any consumption from a bottle of Miller Genuine Draft beer by Pierce while on the beach. In fact, the evidence is to the contrary and shows that he brought Miller Genuine Draft in tall commemorative Harley-Davidson cans to the beach party, which were found the next day by Moreno. Although there was evidence that Pierce was seen drinking Miller Genuine Draft from a bottle at Gilligan's before he left

work, there is no such evidence that he was doing so after he left Gilligan's—which could have been anywhere from 8:30 to 10:30 p.m., depending on which witness' testimony is examined. Moreover, the Miller Genuine Draft observed by Hessler at Pierce's residence was in cans.

The separate pieces of circumstantial evidence which the State relies upon are each reasonably susceptible of inferences of guilt and nonguilt. The State's principle piece of evidence, the beer bottle, is a movable object with Pierce's fingerprint impressed thereupon. But the undisputed evidence is that the object was potentially accessible to Pierce at a time other than when the crime was being committed. Thus, under the precedent we have detailed herein, the fingerprint alone cannot support the conviction. We conclude that the fingerprint in this case is proof of only one thing—that Pierce at some time handled this beer bottle. But the evidence does not establish the critical fact of when he did so. Moreover, we cannot ignore the material discrepancies between Pengelly's detailed description of the intruder as given to Hessler immediately after the crime and Pierce's actual appearance as observed by Hessler within minutes after speaking to Pengelly.

We conclude that the totality of circumstantial evidence, even if reasonably susceptible of two inferences, which we doubt, is such that the inference of nonguilt is stronger than that of guilt. The case should not have been submitted to the jury, and the evidence is not sufficient to sustain the conviction. Therefore, we reverse the conviction and remand the cause with directions that the information be dismissed. Obviously, we need not address Pierce's other assignments of errors.

REVERSED AND REMANDED WITH
DIRECTIONS TO DISMISS.