STATE OF NEBRASKA, APPELLEE, V. TIMOTHY PIERCE, APPELLANT.

537 N.W.2d 323

Filed September 15, 1995. No. S-94-398.

Leonard G. Tabor for appellant.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, and CONNOLLY, JJ.

LANPHIER, J.

Appellant, Timothy Pierce, was convicted by a jury in Scotts Bluff County District Court of forcibly breaking and entering with the intent to commit a felony or steal property, in violation of Neb. Rev. Stat. § 28-507(1) (Reissue 1989). He was also found to be a habitual criminal and was sentenced to an indeterminate term of 14 to 17 years' imprisonment. Upon review, the Nebraska Court of Appeals concluded that Pierce's conviction was based solely upon circumstantial evidence. The Court of Appeals then determined that the inference of nonguilt arising from the circumstantial evidence was stronger than that of guilt and that the case should not have been submitted to the jury. The Court of Appeals, making all reasonable inferences in favor of the accused, held that the evidence was insufficient to sustain the conviction. The Court of Appeals, therefore, reversed the conviction and remanded the cause with directions that the information be dismissed. See *State v. Pierce*, 3 Neb. App. 440, 527 N.W.2d 872 (1995). We granted the State's petition for further review. Because the Court of Appeals applied the wrong standard of review and since we find the evidence sufficient to sustain the conviction upon the appropriate standard of review, we reverse and remand.

## BACKGROUND

On August 25, 1993, at about 1:49 a.m., Julie Pengelly awoke in her bed to find a man with his hands on her shoulders. She screamed and pulled her knees to her chest and kicked the intruder in the chest, catapulting him across her bedroom. He hit the opposite wall and fell into a chair. Pengelly then ran out of her house to a neighbor's, Bonnie Wickard's. Pengelly testified that as she fled, a dog named "Bear," owned by Pierce, chased her. When she got to Wickard's, she knocked on the wall under Wickard's bedroom window and told Wickard she needed

to be let in right away because there was a man in her house. When she got inside, she went straight to the phone and dialed 911.

Vern Hessler, a deputy sheriff, arrived shortly after Pengelly phoned. When Pengelly returned to her house with the deputy, she noticed that the door toward the lake, which had been closed, was open. She also noticed that a screen for a floor-to-ceiling window had been removed from the window and was leaning against a hutch, near the window.

Pengelly and the deputy found a beer bottle outside her house, near the window with the screen removed. Pengelly noticed the beer was cold and still had foam in it. Deputy Hessler testified that he thought that the beer bottle had recently been placed near the window because it appeared as though some of the beer had spilled. Deputy Hessler did not seize the bottle at that time. The next morning, Pengelly retrieved the bottle from where it had originally been found. The bottle was later turned over to an investigator with the Scotts Bluff County Sheriff's Department. The investigator sent the bottle to the Nebraska State Patrol's Criminalistics Laboratory. Linda Brokofsky, a fingerprint examiner for the State Patrol, testified that a latent print on the bottle matched the fingerprint of Pierce's right ring finger.

After the inspection of the premises with Deputy Hessler, Pengelly gave a description of the intruder. At trial, Deputy Hessler testified that Pengelly described the intruder as follows:

> white male suspect, 5'6" tall, average, indicating not muscular build, late 20's to early 30's in age, dishwater blond hair, ear lobe length parted down the middle. She said he had no mustache or beard, no chest hair, no alcohol on his breath, she said he was wearing no shirt or cap, and she was unaware if he had anything below — on below the waist, she didn't observe that.

Pengelly told Deputy Hessler that a neighbor, Pierce, might match the description. Shortly after 3 a.m., Deputy Hessler went two doors down to the house where Pierce was staying. Deputy Hessler testified that Pierce was wearing blue jeans and no shirt, and appeared to have just awakened. Deputy Hessler observed that Pierce had chest hair, a mustache, and a beard.

When questioned, Pierce told Deputy Hessler he had been asleep for several hours.

At trial, Katherine Carmodie Pierce, who was living with Pierce at the time of the break-in, and who had by the time of trial married Pierce, testified that shortly after 12:30 a.m., she and Pierce went to sleep. She also testified that Pierce was with her until Deputy Hessler arrived around 3:15 a.m.

This testimony of Katherine Carmodie Pierce conflicts somewhat with the testimony of Edward Gonzales. Gonzales was at a party on the beach near Pengelly's house the night of the break-in. Gonzales and others at the party testified that Pierce had been at the party on and off during the evening. Gonzales testified that he knew that Pierce left the party around 2 a.m. because it was past the time when beer could be bought. However, on cross-examination Gonzales was asked to read the following portion of his deposition:

> "Okay. And how long did he stay, do you remember? Well, he was sitting down there putting wood into the fire and that, and he talked to Cenovio for a while, I was already inside the tent with Lori and I didn't know when he had left, I didn't know, I have no recall of when he left."

Others at the party were Lori Gonzales, Cenovio Gonzales, Juanita Martinez, Arthur Rivera, Tom Jiminez, Jessica Gomez, and a man named "Jeff" whose last name does not appear in the record. Rivera, Jiminez, and Jeff did not testify. Of those who did testify, only Lori Gonzales and Cenovio Gonzales were asked when Pierce last left the party. Cenovio Gonzales testified that Pierce left the party once and returned with beer. He also testified that Pierce left a second time. Cenovio Gonzales testified that "[w]hen he [Pierce] left the second time he said he was going home because everybody else was going to sleep." After Pierce left this second time, Cenovio Gonzales testified, he went to sleep. Lori Gonzales, however, testified that after Pierce left the second time, he returned to the campsite. She testified that she did not see Pierce leave for the evening because she went to sleep in a tent before he left.

Reynaldo Ramirez was the general manager of Gilligan's, an establishment near the lake which sells beer. He testified that Pierce occasionally worked for him stocking the store's beer

coolers, among other odd jobs. Ramirez testified that single beers were stocked in the coolers and that on August 24, 1993, Pierce worked at the store.

## ASSIGNMENTS OF ERROR

On petition for further review, the State of Nebraska claims the Court of Appeals erred in determining that the inference of nonguilt was stronger than that of guilt, and consequently in making all reasonable inferences in favor of the accused rather than the State.

## STANDARD OF REVIEW

The State, in its assignment of error and brief on its petition for further review, argues that the Court of Appeals erred in applying the standard of review outlined in *State v. Skalberg*, 247 Neb. 150, 526 N.W.2d 67 (1995). Thus, the threshold question to be determined in this appeal is, What is the appropriate standard of review?

The character of the case and the assigned errors and the issues raised therein determine an appellate court's standard of review. Therefore, to determine whether the Court of Appeals applied the appropriate standard of review, we must look to appellant's assignments of error in the court below. Appellant, Pierce, assigned the following errors:

1. Failure of the Court to sustain defendant's Motions for directed verdict at the close of the evidence.

2. The evidence was insufficient as a matter of law to sustain a finding of guilt.

3. The State failed to prove all the essential elements of the crime charged.

4. The Trial Court erred in admitting, over defense objection, Exhibits numbered 8, 12, 13, 14, 15, 16 and 18.

5. Failing to grant Appellant's Motion for New Trial.

6. The sentences imposed by the Court are excessive and an abuse of discretion.

The Court of Appeals did not state which assignment of error its opinion addressed, nor did it address all the assignments of error, having resolved the case on one issue. See *State v. Pierce*, 3 Neb. App. 440, 527 N.W.2d 872 (1995). Its opinion,

nonetheless, concerned each of the first three assignments of error, which, despite each being phrased differently, effectively raises the identical issue: whether the trial court should have directed a verdict of acquittal in Pierce's case, given the evidence adduced. More specifically, then, we must decide relative to those assigned errors what standard governs an appellate court's review of a trial judge's determination in a jury trial of whether to direct a judgment of acquittal.

As will become apparent, this is a complex issue. Thus, the discussion has been divided into separate sections. First, we will attempt to clarify the issue by consolidating the various cases where this issue was raised under different labels. Next, we will discuss the standard used by the Court of Appeals. We will then address the State's contention that the standard used is inconsistent with other rules of law. A discussion of the historical context of this area of law will follow. The historical analysis is necessary to illustrate how perceived prior inconsistencies in the standards of review can be made coherent. Finally, we will state the standard of review applicable to this case.

### CLARIFICATION

We first wish to clarify. Whether the error assigned is stated as the failure to direct a verdict, a claim of insufficiency of the evidence, or failure to grant a motion to dismiss for the failure of the State to present a prima facie case, the standard is the same, although the motions may be made at different times. This is because the issue raised is the same. We often cite a particular variation of phrasing to describe our standard of review based upon how the error has been labeled. The standard is the same. In the following cases, the same phrasing was used to describe our standard of review, regardless of how that issue was labeled by the appellant: *State v. One 1985 Mercedes 190D Automobile*, 247 Neb. 335, 526 N.W.2d 657 (1995) (sufficiency of the evidence); *State v. Hirsch*, 245 Neb. 31, 511 N.W.2d 69 (1994) (directed verdict); *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993) (motion to dismiss). See, also, *State v. Morley*, 239 Neb. 141, 474 N.W.2d 660 (1991) (motion to dismiss for failure to make a prima facie case substantially

identical to motion for directed verdict).

STANDARD USED BY THE COURT OF APPEALS

As stated above, the Court of Appeals applied the standard of review outlined in *State v. Skalberg*, 247 Neb. 150, 526 N.W.2d 67 (1995), quoting the following passages from that opinion:

> "[T]he appellate court must first independently decide as a matter of law whether the circumstantial evidence is reasonably susceptible of two interpretations and whether the inference of nonguilt is stronger than or equal to the inference of guilt. Regarding a question of law, an appellate court has an obligation to reach a conclusion independent of that of the trial court in a judgment under review."

(Emphasis omitted.) *State v. Pierce*, 3 Neb. App. at 447, 527 N.W.2d at 877.

> "In *Covarrubias*, 244 Neb. at 374, 507 N.W.2d at 253, we explained our earlier holding in *State v. LaFreniere*, 240 Neb. 258, 481 N.W.2d 412 (1992): '*LaFreniere* holds that in determining the sufficiency of circumstantial evidence to support a conviction, any fact or circumstance reasonably susceptible of two interpretations must be resolved most favorably to the accused. *LaFreniere* requires a reasonable inference from circumstantial evidence to be taken most favorably to the accused when circumstantial evidence is the only basis upon which to support a conviction and the circumstantial evidence is reasonably susceptible of two interpretations, one of guilt and the other of nonguilt, and neither inference is stronger than the other. See, also, *State v. Ruiz*, 241 Neb. 693, 489 N.W.2d 865 (1992); *State v. Dawson*, 240 Neb. 89, 480 N.W.2d 700 (1992).' "

*State v. Pierce*, 3 Neb. App. at 447–48, 527 N.W.2d at 877.

*Skalberg* also contains the following language pertinent to an appellate review:

> On appeal, the appellate court must first independently decide as a matter of law whether the circumstantial evidence is reasonably susceptible of two interpretations and whether the inference of nonguilt is stronger than or

equal to the inference of guilt.
247 Neb. at 156, 526 N.W.2d at 71.

In interpreting *Skalberg*, the Court of Appeals stated the following:

> We read *Skalberg* as saying that the appellate courts are to *weigh* the inferences and judge their relative strength in order to reach an independent conclusion, as a matter of law, as to where the case falls among the three possibilities [(1) inference of guilt outweighs inference of nonguilt, (2) inference of nonguilt outweighs inference of guilt, and (3) inferences weigh the same] outlined herein.

(Emphasis supplied.) *State v. Pierce*, 3 Neb. App. at 448, 527 N.W.2d at 877.

### APPARENT INCONSISTENCIES

The State urges that to the extent that *Skalberg* requires a weighing of competing inferences deducible from circumstantial evidence, this court is usurping the jury's role as fact finder. The State argues that when there is conflicting evidence presented by multiple witnesses, the jury's resolution of an issue turns upon a credibility determination. Likewise, the State argues that when evidence is conflicting and competing inferences are deducible, an appellate court must make a credibility determination in order to assign a relative weight to each of the competing inferences as *Skalberg* requires.

This court has consistently and repeatedly held for over 100 years that on review of a criminal conviction, an appellate court will not pass on the credibility of witnesses.

> In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, *pass on the credibility of witnesses*, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction.

(Emphasis supplied.) *State v. One 1985 Mercedes 190D Automobile*, 247 Neb. 335, 337, 526 N.W.2d 657, 660 (1995). See, also, *Murphy v. State*, 15 Neb. 383, 19 N.W. 489 (1884)

(no standard by which to weigh or measure the testimony of witnesses can be established by the court).

If *Skalberg* were read to require an appellate court to assign a relative weight to inferences deducible from circumstantial evidence (the inference of guilt being stronger, equal to, or weaker than an inference of nonguilt) and require a credibility determination when the testimony of various witnesses conflicts, it would be inconsistent with our longstanding rule against making credibility determinations. See, *State v. One 1985 Mercedes 190D Automobile, supra; Murphy v. State, supra.*

Additionally, if *Skalberg* were read to permit a directed verdict of acquittal when "circumstantial evidence is *reasonably susceptible of two interpretations*, one of guilt and the other of nonguilt," it would be contrary to our decisions which hold that "a directed verdict is proper only where *reasonable minds cannot differ and can draw but one conclusion from the evidence,* where an issue should be decided as a matter of law." (Emphasis supplied.) *State v. Hirsch,* 245 Neb. 31, 45, 511 N.W.2d 69, 79 (1994). Likewise, this court has stated, "*It is neither for the trial court nor for this court on appeal to draw conclusions of fact when two reasonable inferences may be drawn from the evidence.*" (Emphasis supplied.) *State v. Rowe,* 210 Neb. 419, 426, 315 N.W.2d 250, 256 (1982).

Finally, as previously noted in *State v. Covarrubias,* 244 Neb. 366, 507 N.W.2d 248 (1993), the rule requiring that reasonable inferences be taken most favorably to the accused when reviewing the sufficiency of evidence appears inconsistent with the rule in numerous other cases that an appellate court take the view of circumstantial evidence most favorable to the State.

### HISTORICAL REVIEW

At least as early as 1914, this court had a rule governing appellate review which required an appellate court to take the inference most favorable to the accused when confronted with two inferences deducible from circumstantial evidence. See *Hayward v. State,* 97 Neb. 9, 149 N.W. 105 (1914). There, it was stated: "When two equal presumptions—one in favor of innocence, the other in favor of guilt—are presented, the one in favor of innocence is to be preferred and applied." *Id.* at 12,

149 N.W. at 106. This rule is referred to as the "accused's rule."

Another line of authority appears to have begun with *State v. Fowler*, 193 Neb. 420, 227 N.W.2d 589 (1975). There, relying upon *Glasser v. United States*, 315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680 (1942), and *Hamling v. United States*, 418 U.S. 87, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974), this court held the following: "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the State to support it." *State v. Fowler*, 193 Neb. at 426, 227 N.W.2d at 593. This rule is referred to as the "State's rule."

We have recently attempted to reconcile these two lines of authority. See, *State v. Skalberg*, 247 Neb. 150, 526 N.W.2d 67 (1995); *State v. Covarrubias, supra*; *State v. LaFreniere*, 240 Neb. 258, 481 N.W.2d 412 (1992). However, these attempts at reconciliation have left the questions in the "Apparent Inconsistencies" section unanswered. More importantly, our attempts at reconciliation may have been unnecessary, as we have previously overruled the accused's rule as discussed below.

The accused's rule and the State's rule coexisted until 1981, when *State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981), was decided. In *Buchanan*, we overruled the accused's rule, which required the State to disprove every hypothesis of nonguilt in order to convict. However, subsequent to our decision in *Buchanan*, the accused's rule was referred to and relied upon in *State v. Trimble*, 220 Neb. 639, 371 N.W.2d 302 (1985). In *State v. Morley*, 239 Neb. 141, 474 N.W.2d 660 (1991), we again attempted to exorcise from the halls of justice the accused's rule, referring to it therein as a "dead rule of law" and a "mischievous spirit."

> [I]n *State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981), this court, in an opinion which thoroughly examined the issue, abandoned the rule that a criminal conviction could not be based solely on circumstantial evidence unless the State disproved every hypothesis but that of guilt. *Thenceforth, in criminal cases, circumstantial evidence has usually been treated the same as direct evidence; the State, upon review, is entitled to have all conflicting evidence, direct and circumstantial, viewed in its favor.*

(Emphasis supplied.) *State v. Morley*, 239 Neb. at 148–49, 474 N.W.2d at 666. *Trimble* was thus overruled.

Considering that the accused's rule is the primary issue of this appeal, it is apparent our earlier attempts at clarifying this issue failed. In *State v. Dawson*, 240 Neb. 89, 480 N.W.2d 700 (1992), we again repeated the accused's rule, citing as authority *State v. Earlywine*, 191 Neb. 533, 215 N.W.2d 895 (1974). However, according to *State v. Evans*, 215 Neb. 433, 338 N.W.2d 788 (1983), the accused's rule contained in *Earlywine* had been overruled by *State v. Buchanan, supra*. In *Evans*, this court stated the following:

> As to the sufficiency of the evidence, the defendant argues principally that since the facts and circumstances are reasonably susceptible of two interpretations, they must be resolved in favor of the accused and therefore the evidence is insufficient to convict him.
>
> In making that argument he relies principally upon *State v. Earlywine*, 191 Neb. 533, 215 N.W.2d 895 (1974). In so arguing he overlooks the clear import of the later case of *State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981), which acknowledges that while some decisions of this court may be found which create confusion as to the State's burden in such a case, the better reasoned decisions of other courts, and the reasoning adopted in *Buchanan*, are that one accused of a crime may be convicted on the basis of circumstantial evidence if, taken as a whole, the evidence establishes guilt beyond a reasonable doubt.

215 Neb. at 442–43, 338 N.W.2d at 794.

Thus, to the extent *Dawson* relies on *Earlywine*, an overruled case, as authority for the accused's rule, it is an inaccurate statement of the law. Likewise, our more recent cases citing *Dawson*, or its progeny, as authority for the accused's rule do so improvidently. See *State v. Morley, supra*.

As we have twice previously decided, the line of cases following the State's rule is the better reasoned of the two. See, *State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981); *State v. Evans, supra*. We still find the rationale of those cases persuasive.

The accused's rule would require the State to disprove

alternative explanations of circumstantial evidence in order to maintain a conviction. This practice, alternatively known as the "reasonable hypothesis" standard, has been widely abandoned. See 1 Clifford S. Fishman, Jones on Evidence Civil and Criminal § 5:16 (7th ed. 1992). In *Buchanan*, we quoted the following from a Ninth Circuit Court of Appeals opinion:

> "Moreover, the impression left by appellate court opinions is that the 'reasonable hypothesis' standard may lead to serious departures from the proper appellate role in evaluating the sufficiency of evidence. Courts following the rule exhibit a noticeable tendency to divide the evidence into separate lines of proof, and analyze and test each line of proof independently of others rather than considering the evidence as an interrelated whole. The sufficiency of the evidence is often tested against theoretical and speculative possibilities not fairly raised by the record, and inferences are sometimes considered which, though entirely possible or even probable, are drawn from evidence which the jury may have disbelieved."

210 Neb. at 26, 312 N.W.2d at 688, quoting *United States v. Nelson*, 419 F.2d 1237 (9th Cir. 1969).

Additionally, a fact proven by circumstantial evidence is nonetheless a proven fact. *Holland v. United States*, 348 U.S. 121, 75 S. Ct. 127, 99 L. Ed. 150 (1954). Circumstantial evidence is not inherently less probative than direct evidence. *State v. Buchanan, supra.* Whether evidence is circumstantial or direct, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference." *Holland v. United States*, 348 U.S. at 140. "If the jury is convinced beyond a reasonable doubt, we can require no more." *Id.*

Due process does not require an appellate court, upon review of a criminal conviction, to take the inference most favorable to the accused. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). When reviewing a criminal conviction, the relevant question for an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

(Emphasis omitted.) 443 U.S. at 319. "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.*

## APPROPRIATE STANDARD

For all of the above–stated reasons, we again overrule those cases espousing the accused's rule as an appropriate standard of review. Thus, the Court of Appeals erred in applying the standard of review outlined in *State v. Skalberg*, 247 Neb. 150, 526 N.W.2d 67 (1995). Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same:

> In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction.

*State v. One 1985 Mercedes 190D Automobile*, 247 Neb. 335, 337, 526 N.W.2d 657, 660 (1995). Accord, *State v. Hirsch*, 245 Neb. 31, 511 N.W.2d 69 (1994); *State v. Russell*, 243 Neb. 106, 497 N.W.2d 393 (1993); *State v. Phelps*, 241 Neb. 707, 490 N.W.2d 676 (1992); *State v. Osborn*, 241 Neb. 424, 490 N.W.2d 160 (1992); *State v. 1987 Jeep Wagoneer*, 241 Neb. 397, 488 N.W.2d 546 (1992); *State v. Davis*, 240 Neb. 631, 483 N.W.2d 554 (1992); *State v. Sexton*, 240 Neb. 466, 482 N.W.2d 567 (1992); *State v. Morley*, 239 Neb. 141, 474 N.W.2d 660 (1991); *State v. Saltzman*, 235 Neb. 964, 458 N.W.2d 239 (1990); *State v. Nesbitt*, 226 Neb. 32, 409 N.W.2d 314 (1987); *State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981); *State v. Fowler*, 193 Neb. 420, 227 N.W.2d 589 (1975).

## ANALYSIS

In this case, the properly admitted evidence, viewed and

construed most favorably to the State, is sufficient to sustain Pierce's conviction.

First, the evidence is uncontroverted that on August 25, 1993, at about 1:49 a.m., someone broke into and entered the home of Pengelly. That the breaking and entering was done with the intent to commit a felony can be inferred from the time of the break–in and the uncontroverted evidence that the intruder had placed his hands on Pengelly.

Pierce, however, claims the evidence was insufficient to prove beyond a reasonable doubt that he was the intruder. We disagree. Though each bit of evidence by itself may not conclusively show that Pierce was the intruder, when viewed in its entirety, it is clear that a rational trier of fact could have found beyond a reasonable doubt that Pierce was the intruder.

First, the evidence is uncontroverted that Pierce was in the neighborhood that night, whether he was on the beach at a party or at home sleeping.

Then, there is Pengelly's description of the intruder, coupled with her identification of Pierce as a possible suspect. At trial, Deputy Hessler testified that Pengelly described the intruder as follows:

> white male suspect, 5'6" tall, average, indicating not muscular build, late 20's to early 30's in age, dishwater blond hair, ear lobe length parted down the middle. She said he had no mustache or beard, no chest hair, no alcohol on his breath, she said he was wearing no shirt or cap, and she was unaware if he had anything below — on below the waist, she didn't observe that.

Deputy Hessler's description of Pierce, whom he saw later that same night, was somewhat different. Deputy Hessler testified that Pierce was wearing blue jeans and no shirt and appeared to have just awakened. Hessler observed that Pierce had chest hair, a mustache, and a beard. That Pengelly's description varied on some details is of little consequence. Pengelly testified that it was dark and that she had not seen much more than a silhouette. Additionally, on cross–examination, when asked whether she gave the description quoted above, Pengelly testified that she could not answer yes. She explained that the deputy asked her whether

she saw a particular feature on the intruder, and she would answer yes or no to seeing the feature. Thus, a rational juror could readily explain the discrepancies on the features which would be difficult to see at night when viewing a silhouette. Yet, the jury may have considered the description accurate with regard to the intruder's race, sex, height, and build.

Also indicating that Pierce was the intruder was the evidence showing that a beer bottle with Pierce's fingerprint on it was found near the window with the screen removed.

Finally, the jury could have considered the conflicting evidence concerning Pierce's whereabouts at the time of the break-in as indicative of guilt. The jury may well have chosen to believe that Pierce left the party near the time of the break-in, as Edward Gonzales testified during trial, rather than Katherine Carmodie Pierce's testimony that Pierce went to bed at 12:30 that night.

This evidence is, contrary to the conclusion drawn by the Court of Appeals, sufficient to sustain Pierce's conviction. The trial court, therefore, did not err in overruling Pierce's motion for a directed verdict. Likewise, the State did not fail to prove a prima facie case.

Though Pierce did not raise in this court the errors not addressed by the Court of Appeals, we find them meritless and without need of discussion.

## CONCLUSION

Because the Court of Appeals applied the wrong standard of review and since we find the evidence sufficient to sustain the conviction upon the appropriate standard of review, we reverse the judgment and remand this cause.

REVERSED AND REMANDED.

WRIGHT, J., dissenting.

I respectfully dissent from the result reached by the majority, which reverses the decision of the Nebraska Court of Appeals and reinstates the judgment of conviction and sentence. In my opinion, the evidence was insufficient to submit the matter to the jury for its determination of Pierce's guilt or innocence.

The victim, Julie Pengelly, who had met Pierce several times before the incident, claimed she was awakened when someone

put his hands on her shoulders. She kicked the intruder in the chest, which sent him across the room. She got up and ran out of the house, at which time she heard a dog barking near her windows. She recognized the dog as "Bear," which belonged to Pierce. It was not contested that Pierce let his dog run loose during the night.

Pengelly had no interior lights on at the time of the incident, and her memories of the incident were in silhouette. She was unable to see the facial features of the intruder, but knew it was a male because of the flat chest. She said the intruder had no mustache, beard, or chest hair. She could not say whether the intruder had alcohol on his breath.

A police investigator found no fingerprints on the screen, window, hutch, kitchen counter, or door to the lake side of the house. Pengelly found a beer bottle outside, near the window through which the intruder had entered. A fingerprint was found at the base of the bottle, below the left-hand side of the label. A fingerprint technician from the state crime lab said the fingerprint on the bottle matched Pierce's right ring finger.

Reynaldo Ramirez, the manager of Gilligan's, said that Pierce ordinarily helped stock single bottles of beer when needed and that Pierce had worked on the day preceding the incident. Ramirez said Pierce had two or three beers at the store, and he could smell alcohol on Pierce. Ramirez stated that Pierce took a six-pack of beer when he left, which Ramirez presumed was Miller Genuine Draft because that was Pierce's preferred brand. Ramirez said he gave Pierce a ride from Gilligan's around 10:30 or 11 p.m.

Various witnesses testified that Pierce had come by their campsite on the night of the incident and asked whether they had seen a dog. The witnesses' versions conflicted as to when Pierce was there, how long he stayed, and whether he left and returned. Katherine Carmodie Pierce stated that she and Pierce had gone to bed at 12:30 a.m. and that Pierce did not get out of bed between then and the time that the deputy came to their house at 3:15 a.m.

Pierce had a mustache and chest hair. Pierce had been drinking prior to the time of the incident, yet Pengelly had no memory of alcohol on the intruder's breath. Other witnesses

testified that Pierce had been drinking during the evening, and one witness thought he was drunk. Pierce ordinarily stocked single bottles of beer at Gilligan's, where he worked on the day preceding the incident, and his fingerprints could have been transferred to the bottles at that time.

In my opinion, there was not sufficient evidence to submit the case to the jury.