STATE OF NEBRASKA, APPELLEE, V. TED SALTZMAN, APPELLANT.
458 N.W.2d 239

Filed July 27, 1990.   No. 89-1195.

David L. Kimble, of Souchek & Kimble, for appellant.

Robert M. Spire, Attorney General, and Denise E. Frost for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

PER CURIAM.

Following a bench trial, defendant-appellant, Ted Saltzman, was adjudged guilty of three counts of committing terroristic threats, in violation of Neb. Rev. Stat. § 28-311.01 (Reissue 1989). Saltzman urges that the evidence was insufficient to support the convictions. The record failing to support that assignment of error, we affirm.

The charges for which Saltzman was convicted arise from a number of telephone calls he made to three individuals living in

Milford, Nebraska. Each of the individuals had been involved in a case in which Saltzman was originally charged with a 1986 sexual assault of an 11-year-old girl.

One of the recipients of Saltzman's calls was Connie Miller, a protective services worker with the Department of Social Services who, since the time of the 1986 assault, had been working with the 11-year-old girl. Miller testified that one of her duties, after the assault was discovered and the child was removed from her mother's home, was to prevent Saltzman, who was then living with the girl's mother, from having contact with the girl during visitations between the girl and her mother. According to Miller, Saltzman would accompany the mother to visitations and, while waiting for her, sit in the vehicle in which they came or walk around the outside of the courthouse where the visitations were held.

Saltzman telephoned Miller's residence on April 29, 1988, at 10:40 p.m. After Miller answered the telephone, Saltzman told her, "[Y]ou're gonna die, you bitch!" and then hung up. Miller testified that she did not recognize the voice but that the caller was an adult male who sounded as if "he was trying to disguise his voice." After the initial telephone call, Miller's household received five or six more calls during which, after she, her husband, or her daughter answered, the caller would say nothing and then hang up. Miller testified that the initial call upset and annoyed her and that although she was not terrified, she considered the call a threat.

On the same evening between 9:30 and 11:05 p.m., Saltzman also made six telephone calls to the residence of Lowell Sellmeyer, the chief of police for the city of Milford, who had investigated the charges against Saltzman. During the second call, which was the first call the chief answered, Saltzman stated, "[Y]ou're going to die. I'm going to blow up your house." According to Sellmeyer, the caller used

> a lot of profanity and said that he was going to get even. I said, well, why — what do you want to get even about? I questioned him as to why he was mad at me. And I didn't recognize his voice right away, but he mentioned that I had set him up and I had set up other persons like — and he mentioned the name, Dennis Stutzman. He said that he

was gonna get even. And he said, you setted me up. And I think it was at that time that I kinda suspected that it was Ted Saltzman.

During the conversation, Saltzman talked about the specifics of the case involving the 11-year-old girl and said that

he had not had sex with her and we had make it look like . . . he had. And then he went through the same jargon again about blowing up the house and we were going to die and he's going to get even. He mentioned that he was also going to get the mayor and the county attorney. And he mentioned the county attorney by name.

Saltzman made similar statements throughout the remaining calls.

Sellmeyer testified that he had previously talked to Saltzman over the telephone and that he eventually recognized the voice as Saltzman's "[b]ecause of his particular way of speaking." According to Sellmeyer, "it was definitely Ted Saltzman making all of the calls." Sellmeyer further related: "I thought that I detected maybe that [Saltzman] had been using alcohol and may have been under the influence." There was also evidence that during one of the calls, Saltzman realized that two other officers were listening to the conversation, became apologetic, stated that he was confused, and agreed he needed to seek counseling. Sellmeyer stated that he was not terrified by the calls but was intimidated, threatened, and annoyed.

About 2 months later, Saltzman telephoned Barbara Johnson. Johnson testified that she had become involved in the sexual assault case against Saltzman when her daughter, a friend of the victim's, "told me some things that Ted was doing to her girl friend and she was upset over it. And it was happening at times when my daughter was spending the night over there." Johnson reported the incidents to the police, and an investigation was conducted on the basis of her report. Subsequently, Johnson testified against Saltzman.

According to Johnson, Saltzman called her residence on July 9, 1988, at about 9:45 p.m. Johnson testified that she answered the telephone, recognized the voice as Saltzman's, and then gave the receiver to her ex-husband, who testified that he also recognized Saltzman's voice and that Saltzman stated "he was

going to get my wife and kids." According to Barbara Johnson, Saltzman had previously telephoned her and threatened her and her children. She testified that she was upset, angry, and felt threatened because of the call on July 9.

The Milford police were able to trace the calls made to Sellmeyer's residence and discovered that the calls originated from an address in Lincoln, Nebraska, where Saltzman resided at the time. Larry Wentink, an area manager for Lincoln Telephone Company, testified that during April 1988, Saltzman had telephone service at the Lincoln address but that his service was disconnected in May. Saltzman's long-distance telephone records show that on April 29, 1988, six long-distance calls were placed from his telephone number to Sellmeyer's telephone number, and eight long-distance calls were placed to Miller's telephone number.

Saltzman's brother testified that during April 1988, he, his fiancee, and a friend also lived at the Lincoln address with Saltzman. According to the brother, when he was discussing the April telephone bill with the friend, the friend admitted that he had made the calls to Milford on April 29, 1988, and stated that he would pay for them. The brother admitted when cross-examined by the State, however, that when he arrived home on the evening of April 29, Saltzman was talking on the telephone, and when the brother asked Saltzman to whom he was talking, Saltzman said, "Sellmeyer."

Saltzman contends that the State did not present sufficient evidence to sustain his convictions for committing terroristic threats on any of the three counts alleged in the information. We therefore recall that a verdict in a criminal case will be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. In determining the sufficiency of the evidence to sustain the conviction, it is not the province of the Supreme Court to resolve conflicts in the evidence, pass on the credibility of the witnesses, determine the plausibility of explanations, or weigh the evidence; such matters are for the finder of fact. *State v. Wright, ante* p. 564, 456 N.W.2d 288 (1990); *State v. Badami, ante* p. 118, 453 N.W.2d 746 (1990); *State v. Jones, ante* p. 1, 453 N.W.2d 447 (1990); *State v. Boppre,* 234 Neb. 922, 453 N.W.2d 406 (1990).

One accused of a crime may be convicted on the basis of circumstantial evidence if the evidence, viewed as a whole, establishes the guilt of the defendant beyond a reasonable doubt. The State is not required to disprove every hypothesis except that of guilt. *State v. Badami, supra.*

Section 28-311.01 provides in relevant part: "(1) A person commits terroristic threats if he or she threatens to commit any crime of violence: (a) With the intent to terrorize another . . . or (c) In reckless disregard of the risk of causing such terror . . . ."

Saltzman first urges that the evidence to support his conviction for telephoning Barbara Johnson's residence and making terroristic threats is lacking in that the State failed to prove a threat to commit a crime of violence or that he had the requisite intent.

In the first regard, Saltzman claims that his statement to Johnson's ex-husband that he was going to get the ex-husband's wife and children does not constitute a threat to commit a crime of violence within the purview of the Nebraska Criminal Code. Contrary to Saltzman's claim, the evidence presented was sufficient for the trier of fact to conclude that Saltzman, in retaliation for Barbara Johnson's involvement in the sexual assault case, was threatening to commit a crime of violence against her and her children.

Similarly meritless is Saltzman's claim that the evidence fails to establish that he possessed the requisite intent. When the sufficiency of the evidence as to criminal intent is questioned, a direct expression of intention by the actor is not required; the intent with which an act is committed involves a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident. See, *State v. Broussard, ante* p. 809, 457 N.W.2d 457 (1990); *State v. Swigart,* 233 Neb. 517, 446 N.W.2d 216 (1989); *State v. Tweedy,* 224 Neb. 715, 400 N.W.2d 865 (1987); *State v. Welchel,* 207 Neb. 337, 299 N.W.2d 155 (1980). Whether a defendant possesses the requisite state of mind is a question of fact and may be proved by circumstantial evidence. See *State v. Willett,* 233 Neb. 243, 444 N.W.2d 672 (1989). Considering the language Saltzman used and the circumstances of the past relationship between Saltzman and Johnson, the evidence is sufficient to

support a conclusion that in making the threat to Johnson's ex-husband, Saltzman possessed, out of a sense of revenge, the intent to terrorize Johnson, her ex-husband, and her children. Therefore, there was sufficient evidence to sustain Saltzman's conviction on this count.

Saltzman next urges that the State failed to prove that he was the person who telephoned Miller in that Miller could not identify the caller's voice, the call was placed from a residence Saltzman shared with three other people, one of whom admitted making the call, and there was no evidence that Saltzman "bore [Miller] any ill will." Brief for appellant at 8. There was evidence, however, that Saltzman telephoned Sellmeyer on the same night he had telephoned Miller and accused Sellmeyer of "setting him up" in the sexual assault case. This evidence, along with the evidence that the call to Miller originated from a residence where Saltzman was residing, is sufficient for the trier of fact to conclude that Saltzman was the one who telephoned Miller as a result of her connection with the sexual assault victim. Again, the evidence is sufficient to sustain Saltzman's conviction on this count.

Finally, Saltzman claims that the State failed to prove that he had "the intent to terrorize another" when he telephoned Sellmeyer. Brief for appellant at 10. In this regard, Saltzman urges that "it is difficult to see how this drunken, confused man could have intended seriously to do anything to anyone after verbally warning anyone and everyone who would listen to him on the 29th of April, 1988." Brief for appellant at 10.

If Saltzman's claim is that he was intoxicated and confused and therefore unable to form the requisite intent, that claim fails. The fact that an accused, at the time of the criminal act charged, was drunk or intoxicated does not constitute, as a matter of law, a defense to an offense which requires proof that the defendant possessed some intent. *State v. Hoffman*, 227 Neb. 131, 416 N.W.2d 231 (1987). See, also, *State v. Reynolds, ante* p. 662, 457 N.W.2d 405 (1990). Ordinarily, voluntary intoxication does not justify or excuse a crime, unless an accused is intoxicated to an extent or degree that the accused is incapable of forming the intent required as an element of the crime charged. *State v. Reynolds, supra*; *State v. Lesiak*, 234

Neb. 163, 449 N.W.2d 550 (1989); *State v. Hoffman, supra.* There is no evidence as to how much, if any, alcohol Saltzman drank before making the calls to Sellmeyer, but there is evidence that Saltzman was able to dial Sellmeyer's telephone number and talk coherently to him about past events. Such evidence provided the trier of fact with sufficient circumstantial evidence to conclude that Saltzman was able to form the intent to terrorize Sellmeyer as a result of making threatening telephone calls to him.

If Saltzman's claim is that he lacked the intent to execute his threats, he misconstrues the terroristic threats statute. The crime does not require an intent to execute the threats made; rather, it requires, as relevant here, the intent to terrorize the recipient as a result of the threat, see *State v. Willett, supra,* or a reckless disregard of the risk of causing such terror. Saltzman told Sellmeyer, "[Y]ou're going to die," and threatened to "blow up [Sellmeyer's] house." Further, Saltzman informed Sellmeyer that "he was going to get even" because Sellmeyer had "setted [him] up" on the sexual assault charge. This evidence is sufficient to support a conclusion that Saltzman intended to terrorize Sellmeyer because of Sellmeyer's investigation of the sexual assault charges against him.

Lastly, Saltzman presumably makes the claim that the evidence shows Sellmeyer did not feel terrified. Again, Saltzman misconstrues the terroristic threats statute. The statute requires not that the recipient of the threat be terrorized; rather, it requires, in relevant part, that the actor have the intent to terrorize another as a result of the threat. The record contains sufficient circumstantial evidence to support a conclusion that Saltzman had the requisite intent. Therefore, there is sufficient evidence to support Saltzman's conviction on this count as well.

AFFIRMED.