IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. LUNDGREN


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

JOHN C. LUNDGREN, APPELLANT.


Filed October 6, 2020.    No. A-20-018.


Appeal from the District Court for Sheridan County: TRAVIS P. O'GORMAN, Judge. Affirmed.

William E. Madelung, of Madelung Law Office, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.


MOORE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Following a jury trial in the district court for Sheridan County, John C. Lundgren was convicted of obstructing a peace officer, terroristic threats, and two counts of disturbing the peace. On appeal to this court, Lundgren asserts that the evidence at trial was insufficient to support his convictions for obstructing a peace officer and terroristic threats. He also assigns that "[t]he sentence" imposed by the district court was excessive. We affirm Lundgren's convictions and sentences.

## II. BACKGROUND

Lundgren's convictions in this case resulted from two separate incidents that occurred on two consecutive days in July 2018 in a neighborhood on North Maple Street in Gordon, Nebraska. Kaden Russell and his wife, Claire Russell, lived next door to Lundgren. On July 17, they were

- 1 -

outside with a couple other people sitting on their "back patio with a fire pit going," having "[d]inner, s'mores, just hanging out in [their] back yard." According to the Russells, Lundgren began to stare at them from Lundgren's side of the property line. Kaden shouted at Lundgren to "mind [his] own business," to which Lundgren began to yell in response. According to Kaden, Lundgren had "a stick or something" in his right hand; he believed Lundgren was antagonizing the Russells' dogs. Kaden described Lundgren's demeanor as "aggressive and angry." After a period of exchanged yelling between Kaden and Lundgren, Claire called the police.

At approximately 9:10 p.m., Officer Benjamin Plemons arrived and followed the sound of Lundgren's shouting. According to Officer Plemons, "[t]he words were unintelligible." He was not sure "if they were English or what," but he was unable to understand what Lundgren was shouting. Officer Plemons described Lundgren's demeanor as "tense as though he was kind of flexing up his arms and he was definitely shouting. Seemed angry." Officer Plemons first sought to ask Lundgren questions in order to investigate the circumstances, and he directed Lundgren to come and speak with him, but Lundgren did not comply. During this time, Lundgren continued shouting, and Officer Plemons again did not understand what Lundgren was saying because he did not think the words were English.

Lundgren then began to approach Officer Plemons with the same "angry and upset" demeanor initially observed, and kept both his hands out of Officer Plemons' view. In the interest of his safety and for others in the vicinity, Officer Plemons told Lundgren that he was going to place Lundgren in investigative detention. He advised Lundgren that he was going to detain him, pat him down for weapons, and after that, the handcuffs would be removed and they would talk. Lundgren did not respond to Officer Plemons' directions, although he did finally keep both of his hands where Officer Plemons could see them. Officer Plemons instructed Lundgren to put his hands behind his back, which he did not do, so Officer Plemons reached and grabbed Lundgren's right wrist and grabbed onto his right arm. Lundgren shook and pushed his hand free of Officer Plemons' hand and pushed Officer Plemons' hands away from him (Lundgren), breaking Officer Plemons' grasp from Lundgren's wrist. Lundgren then, with the palm of his left hand, "stiff-arm[ed]" Officer Plemons in the chest, which knocked the officer "a little bit off balance and made [him] stumble backwards a bit." Lundgren then walked to the door of his home, told Officer Plemons to "come back with a warrant" if he wanted to talk, and he then "slammed the door behind him" despite Officer Plemons' commands for Lundgren to stop. Officer Plemons knocked on the door and instructed Lundgren to come out and talk, but Lundgren did not respond.

The second incident occurred the following morning on July 18, 2018, and involved a homeowner across the street from Lundgren, Misti S., who also owned a couple lots adjacent to her family's home. Misti's two teenage sons were demolishing a house on one of those lots. The oldest son testified that Lundgren had been yelling at them constantly throughout the morning. The oldest son recognized Lundgren's voice, saying, "He has a distinct voice. You can tell it's him yelling. We've dealt with it since he's moved in there." The oldest son said that on the morning of July 18, the yelling "was pretty constant," and that Lundgren would "stop for a little bit and then yell again and then stop for a bit and then yell again." The oldest son believed the yelling was directed at him and his brother because they were "the only ones outside." While most of the yelling was "gibberish," at one point, the oldest son heard Lundgren shout, "I have a weapon pointed at you." In response, the oldest son told his brother to "run inside and grab [their] mom."

The oldest son "didn't know where [Lundgren] was," or if "he actually had a weapon," but he had "no clue what [Lundgren was] capable of" and he "didn't know if he had a weapon somewhere." The oldest son "hurried up" and put his tools away and "ran home." Misti contacted law enforcement. Lundgren continued to shout throughout this time, and Misti heard Lundgren again yell that he had a weapon pointed at them.

At approximately 10 a.m., Sheriff Jeff Brewer spoke briefly with Misti before moving toward Lundgren's residence. Lundgren continued shouting as Sheriff Brewer approached the residence. According to Sheriff Brewer, "the front door had a whole bunch of limbs and debris up against it so you couldn't really get to the front door," so he walked around to the back door of the house. While walking around the house, Sheriff Brewer saw and heard Lundgren shouting from an open window on the north side of his home. Lundgren was yelling towards the other side of North Maple Street, "I got a gun. I know how to use it." Upon Sheriff Brewer's attempt to speak with him, Lundgren closed the window and the curtains. Sheriff Brewer knocked on the backdoor of Lundgren's residence, and Lundgren told him to leave the property before shutting the door. Sheriff Brewer remained in the area until Officer Plemons returned to the block later that day.

The State filed an information on September 6, 2018, charging Lundgren with count I, third degree assault; counts II and V, disturbing the peace; count III, obstructing a peace officer; and count IV, terroristic threats. Counts I, II, and III were related to the incident on July 17, and counts IV and V were related to the incident on July 18.

Following a jury trial, the jury found Lundgren guilty of obstructing a peace officer, terroristic threats, and both counts of disturbing the peace. The jury found Lundgren not guilty of third degree assault (count I).

At the sentencing hearing on December 10, 2019, the district court sentenced Lundgren, age 72 at the time, to 10 days in the county jail for each count of disturbing the peace, 90 days in the county jail for obstructing a peace officer, and 255 days in the county jail for terroristic threats. The court ordered these sentences to run consecutively, for a total period of "one year in the county jail," with credit for 2 days already served. The court additionally ordered that Lundgren be placed on 9 months of postrelease supervision. Lundgren now appeals.

## III. ASSIGNMENTS OF ERROR

Lundgren assigns as error: (1) the evidence presented at trial was insufficient to support his convictions for obstruction of a peace officer and terroristic threats and (2) "[t]he sentence" imposed by the district court was excessive.

## IV. STANDARD OF REVIEW

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: in reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020).

An appellate court reviews criminal sentences for abuse of discretion, which occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Williams*, 306 Neb. 261, 945 N.W.2d 124 (2020).

## V. ANALYSIS

Lundgren asserts that the evidence provided at trial was insufficient to convict him for obstructing a peace officer and terroristic threats. He further argues that the sentence imposed by the district court was excessive.

### 1. SUFFICIENCY OF EVIDENCE

### (a) Obstructing Peace Officer

Lundgren was convicted of obstructing a peace officer pursuant to Neb. Rev. Stat. § 28-906(1) (Reissue 2016), which provides:

A person commits the offense of obstructing a peace officer, when, by using or threatening to use violence, force, physical interference, or obstacle, he or she intentionally obstructs, impairs, or hinders (a) the enforcement of the penal law or the preservation of the peace by a peace officer or judge acting under color of his or her official authority or (b) a police animal assisting a peace officer acting pursuant to the peace officer's official authority.

The defendant's conduct, however expressed, must have used or threatened to use either violence, force, physical interference, or obstacle to intentionally obstruct, impair, or hinder a peace officer or judge who was acting to either enforce penal law or preserve the peace under color of his or her official authority. *State v. Ferrin*, 305 Neb. 762, 942 N.W.2d 404 (2020). "Preservation of the peace," as used in § 28-906(1), means maintaining the tranquility enjoyed by members of a community where good order reigns. *In re Interest of Richter*, 226 Neb. 874, 415 N.W.2d 476 (1987). The act of running away from police interposes a physical obstacle that can obstruct, impair, or hinder an officer's efforts to preserve the peace. *State v. Ferrin, supra*. The mere verbal refusal to provide information to an officer does not constitute an obstacle to the enforcement of the penal laws as contemplated by this section. *State v. Yeutter*, 252 Neb. 857, 566 N.W.2d 387 (1997).

Lundgren asserts that the evidence was insufficient to convict him for obstructing a peace officer because, at the time Officer Plemons interacted with Lundgren, Officer Plemons was not acting to enforce penal law or preserve the peace under color of his official authority. Lundgren argues that Officer Plemons' attempts to question and detain Lundgren and Lundgren's responsive actions occurred before Officer Plemons "had even started to ascertain what part of the penal code needed to be enforced or whether even any person's peace needed to be preserved," and the evidence therefore was insufficient to convict Lundgren for obstructing Officer Plemons. Brief for appellant at 10.

The evidence offered at trial showed Officer Plemons responded to a dispatch call concerning a neighborhood disturbance and, upon his arrival to the scene, he found Lundgren in an agitated state shouting toward the Russells. Based on his observations, Officer Plemons attempted to question Lundgren, who ignored Officer Plemons' directions to stop from walking

away towards his home. When Officer Plemons attempted to handcuff Lundgren for a brief investigative detention, Lundgren pulled himself out from Officer Plemons' grip and "stiff-arm[ed]" Officer Plemons to prevent further detention. Lundgren then returned to his home, shut the door behind him, and again refused to respond to Officer Plemons' directions to talk with him.

Viewing this evidence in the light most favorable to the prosecution, a rational jury could have found beyond reasonable doubt that Lundgren used violence, force, physical interference, or obstacle to intentionally obstruct, hinder, or impair Officer Plemons' efforts to preserve the peace under color of his official authority. Thus, the evidence presented at trial was sufficient to support Lundgren's conviction for obstructing a peace officer.

### (b) Terroristic Threats

Lundgren was convicted of terroristic threats pursuant to Neb. Rev. Stat. § 28-311.01 (Reissue 2016), which provides:

> (1) A person commits terroristic threats if he or she threatens to commit any crime of violence:
> (a) With the intent to terrorize another;
> (b) With the intent of causing the evacuation of a building, place of assembly, or facility of public transportation; or
> (c) In reckless disregard of the risk of causing such terror or evacuation.

The intent to terrorize another is the intent to produce intense fear or anxiety in another. *State v. Smith*, 267 Neb. 917, 678 N.W.2d 733 (2004). Neb. Rev. Stat. § 28-109(20) (Reissue 2016) defines "recklessly" as:

> [A]cting with respect to a material element of an offense when any person disregards a substantial and unjustifiable risk that the material element exists or will result from his or her conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to the actor, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

See, also, Black's Law Dictionary 506 (8th ed. 2004) (reckless disregard is the "[c]onscious indifference to the consequences of one's act"). When the sufficiency of the evidence as to criminal intent is questioned, a direct expression of intention by the actor is not required; the intent with which an act is committed involves a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident. *State v. Saltzman*, 235 Neb. 964, 458 N.W.2d 239 (1990). The crime of terroristic threats does not require an intent to execute the threat made; rather, it requires an intent to terrorize another or a reckless disregard of the risk of causing such terror. *Id.*

Lundgren asserts that the evidence was insufficient to support his conviction for terroristic threats because the evidence offered at trial could not prove the requisite mental state necessary to convict. He argues the phrases he yelled were defensive in nature, and he further contends that no

evidence demonstrated that he had a weapon, directed his yelling at any particular person, or left his home over the course of the morning.

The evidence offered at trial showed that Misti and her sons heard Lundgren yelling during the morning of July 18, 2018, including yelling the words, "I have a weapon pointed at you," on at least two different occasions. While Lundgren was not visible to the oldest son and his brother, they were the only people outside in the area at the time. Misti testified that when she went outside to find her oldest son, she could see the top of Lundgren's head as he stood in his garage across North Maple Street, shouting in her direction that he had a weapon pointed at them. Only Misti and her oldest son were outside to be the target of Lundgren's yelling at that point. Lundgren's yelling and indicating he had a weapon pointed at the only people in the area, whether intentional or reckless, was a threat of violence directed at Misti and her sons. Lundgren continued shouting as Sheriff Brewer arrived. Sheriff Brewer witnessed Lundgren shout towards the other side of North Maple Street, where Misti and her sons were, that he had a gun and knew how to use it. No prior interaction occurred between Lundgren and Misti or her sons that would give cause for Lundgren to shout warnings, defensive or otherwise, towards them that morning.

Viewing this evidence in the light most favorable to the State, a rational jury could have found beyond a reasonable doubt that Lundgren threatened to commit an act of violence either with reckless disregard of the risk of causing such terror or intending to terrorize Misti or her sons. Thus, the evidence offered at trial was sufficient to support Lundgren's conviction for terroristic threats.

## 2. EXCESSIVE SENTENCE

Lundgren asserts on appeal that his sentence was excessive. He does not address each sentence separately, and we take his reference to a singular sentence to mean the 365 total days resulting from the combined sentences of the four different counts for which he was convicted.

Lundgren was convicted of one count of terroristic threats, a Class IIIA felony, for which he was sentenced by oral pronouncement to 255 days in the county jail and 9 months' postrelease supervision. A Class IIIA felony is punishable by a maximum of 3 years' imprisonment and 18 months' postrelease supervision, or a $10,000 fine, or both; there is no minimum term of imprisonment, but there is a minimum of 9 months' postrelease supervision if imprisonment is imposed. See Neb. Rev. Stat. § 28-105(1) (Reissue 2016). For his conviction on one count of obstructing a police officer, a Class I misdemeanor, Lundgren was sentenced by oral pronouncement to 90 days in the county jail. A Class I misdemeanor is punishable by a maximum of not more than 1 year's imprisonment, or a $1,000 fine, or both. See Neb. Rev. Stat. § 28-106(1) (Reissue 2016). As for his convictions on two counts of disturbing the peace, each a Class III misdemeanor, Lundgren was sentenced by oral pronouncement to 10 days in the county jail for each conviction. A Class III misdemeanor is punishable by a maximum of 3 months' imprisonment, or a $500 fine, or both. See § 28-106(1). Lundgren's sentences are all within the statutory range.

On December 16, 2019, the district court entered a sentencing order which set forth Lundgren's sentences for each conviction as pronounced orally by the court as described above; the order also indicated that the terms of Lundgren's postrelease supervision were set forth in a separate order filed in the case. That separate order for postrelease supervision incorrectly

numbered Lundgren's counts, and as pointed out by the State, also incorrectly reflected that Lundgren's sentence for terroristic threats was 300 days in jail rather than 255 days. The December 16 written sentencing order is consistent with the oral pronouncement of sentence, and any inconsistent references in the separate postrelease supervision order should be disregarded. See *State v. Olbricht*, 294 Neb. 974, 885 N.W.2d 699 (2016) (where sentence orally pronounced at sentencing hearing differs from later written sentence, former prevails).

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Williams*, 306 Neb. 261, 945 N.W.2d 124 (2020). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

Lundgren was 72 years old at the time of sentencing. He has a bachelor's degree and has been retired since 2008. His prior criminal history includes two convictions in 2012 for harassment in Colorado and one conviction in 2016 for disturbing the peace and resisting arrest in Nebraska. Lundgren also had subsequent criminal charges in Nebraska for third degree assault in August 2018 and disturbing the peace in September 2019.

The probation officer conducted a "Level of Service/Case Management Inventory" and assessed Lundgren as an overall high risk to reoffend. The presentence investigation report (PSR) indicates that Lundgren scored "very high risk" in the criminogenic risk factor domain for procriminal attitude/orientation. He scored "high risk" in the domains for leisure/recreation and alcohol/drug problem. He scored "medium risk" in the domains for criminal history and family/marital. He scored "low risk" in the domain for antisocial pattern. And he scored "very low risk" in the domains for education/employment and companions.

At the sentencing hearing, Lundgren's counsel stated that Lundgren has suffered from mental health issues for which he was seeking treatment and otherwise taking steps to remedy. Citing these issues and steps taken towards treatment, as well as his age and prior record, Lundgren's counsel asked the district court to consider placing Lundgren on probation, stating that such a sentence would be in the best interests of the community and Lundgren.

The district court stated it had considered the relevant sentencing factors and the PSR in addition to the statements of Lundgren and his counsel. The court noted Lundgren's prior and subsequent criminal history, identifying the current offenses as part of a pattern of "[a]ssaultive-type behavior, harassment-type cases." The court stated that "probation [was] really not an option" and "anything less than some incarceration would depreciate the seriousness of the offense and promote a disrespect for the law." The court then sentenced Lundgren as set forth previously.

Lundgren contends on appeal that the district court did not afford the proper weight to factors and characteristics weighing against incarceration. See Neb. Rev. Stat. § 29-2260(2) and

(3) (Reissue 2016). He further argues that a lesser sentence would have better served the interests of the community and himself in light of his age, prior record, and mental health and medical issues.

Having considered the relevant factors in Lundgren's case, we find that Lundgren's combined sentence of 365 days in county jail for his four convictions was not excessive or an abuse of discretion. See *State v. Williams, supra* (sentence imposed within statutory limits will not be disturbed on appeal absent abuse of discretion by trial court).

## VI. CONCLUSION

For the reasons stated above, we affirm Lundgren's convictions and sentences.

AFFIRMED.