Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/15/2022 12:07 AM CDT

State of Nebraska, appellee, v.
John T. Bryant, Sr., appellant.

___ N.W.2d ___

Filed March 18, 2022.    No. S-21-428.

1. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

2. **Legislature: Intent: Statutes: Appeal and Error.** The intent of the Legislature is generally expressed by omission as well as by inclusion, and an appellate court is not at liberty to add language to the plain terms of a statute to restrict its meaning.

3. **Criminal Law.** Neb. Rev. Stat. § 28-311.01 (Reissue 2016) does not require that the threatened crime of violence be imminent.

4. ____. The threat for purposes of Neb. Rev. Stat. § 28-311.01 (Reissue 2016) may be written, oral, physical, or any combination thereof.

5. ____. Whether the defendant threatens a crime of violence need not be determined solely based upon the literal meaning of the defendant's words alone.

6. ____. Whether particular conduct constitutes a threat for purposes of Neb. Rev. Stat. § 28-311.01 (Reissue 2016) depends on the context of the interaction between the people involved.

7. **Appeal and Error: Words and Phrases.** Appellate courts often turn to dictionaries to ascertain a word's plain and ordinary meaning.

8. **Criminal Law: Evidence: Intent.** The intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident.

Appeal from the District Court for Madison County: Mark A. Johnson, Judge. Affirmed.

Kurt P. Leffler for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## INTRODUCTION

In a direct appeal following convictions for terroristic threats, assault in the third degree, and intimidation by phone call, the appellant argues that there was insufficient evidence to support his convictions.

## BACKGROUND

Following a jury trial, John T. Bryant, Sr., was convicted of terroristic threats, a Class IIIA felony, in violation of Neb. Rev. Stat. § 28-311.01 (Reissue 2016); intimidation by phone call, a Class III misdemeanor, in violation of Neb. Rev. Stat. § 28-1310 (Cum. Supp. 2020); and assault in the third degree, a Class I misdemeanor, in violation of Neb. Rev. Stat. § 28-310 (Reissue 2016), which was enhanced to a Class IIIA felony under Neb. Rev. Stat. § 28-115(1)(c) (Cum. Supp. 2020), because it was committed against a pregnant woman.

Bryant's convictions stem from events that occurred on September 6, 2019, pertaining to three children Bryant shares with his ex-wife, who has an additional three children from another relationship. Based on allegations against the ex-wife, a juvenile court judge entered an order for the Department of Health and Human Services (DHHS) to have temporary physical custody of all of the ex-wife's children, including those she shared with Bryant. At the time of the order, Bryant and his ex-wife's three children were in Bryant's physical custody after being removed from the ex-wife's care following the

incident that led to commencement of a juvenile case. DHHS soon sought and obtained an order of temporary custody with their agency, rather than with Bryant, because of DHHS' concerns relating to prior abusive behavior by Bryant toward his ex-wife that occurred in front of the children.

K.B. was the DHHS caseworker assigned to coordinate the execution of the temporary custody order. On September 6, 2019, she was 7 weeks pregnant. K.B. testified at trial that once she received notice of the order, she coordinated with her team of child and family service specialists.

She testified that she called Bryant at 11:44 a.m. During that phone call, K.B. notified Bryant of the order and explained that her job was to pick the children up. She testified that Bryant was very upset and hung up on her.

K.B. testified that 1 minute later, at 11:45 a.m., Bryant called back. During the conversation that ensued, she told Bryant she was sending two DHHS workers to meet him to pick up the children. Bryant responded that K.B. "was not taking his kids."

K.B. stated she maintained contact with Bryant throughout the day, trying to get him to cooperate. K.B. had sent two family service specialists to Bryant's house for the removal of the children from Bryant's custody, with the assistance of the local sheriff's department. But when K.B. was at the ex-wife's house that afternoon on business pertaining to the order, a family service specialist informed K.B. that Bryant and his three children were not at his home.

At 3:45 p.m., K.B. called Bryant to obtain his and the children's location. During the conversation that ensued, Bryant stated a named judge "deserved a bullet in the head" and a named juvenile court deputy county attorney "deserved a bullet, too." Bryant then ended that call.

The judge in question had presided over Bryant's divorce from his ex-wife and had awarded the ex-wife custodial rights subject to parenting time with Bryant. The named deputy county attorney was the State's representative in the juvenile case for which the temporary custody order had been issued.

K.B. testified that she was in the ex-wife's yard when Bryant called her back at 3:53 p.m. and immediately stated, "take my [expletive] kids, consider yourself next on my list for a bullet."

K.B. testified that Bryant sounded angry. She testified that Bryant's statement about being next on his list for a bullet frightened her. K.B. testified that she was so upset she vomited in the ex-wife's yard. K.B. testified that she was "absolutely terrified" and trembling as she continued to coordinate the execution of the order.

Screenshots of K.B.'s call history on her work phone generally corroborated her testimony. They show two phone calls between K.B. and Bryant at approximately 11:45 a.m., a call from K.B. to Bryant at 3:45 p.m., and a call from Bryant to K.B. at 3:53 p.m.

One of the family service specialists testified that she called K.B. around 3:30 or 3:40 p.m. to let her know they had arrived at Bryant's house and he and the children were not there. She noticed that K.B. sounded "shaky [and] sad." K.B. called her back a few minutes after that. The family service specialist described that during the phone call, K.B. was sobbing, was throwing up, and reported that Bryant had "told her that she was next, like on his list for a bullet like to the head."

Bryant's version of events differed somewhat from K.B.'s version. He testified that around 10:15 a.m., he left with his children to travel to his oldest daughter's home for a weekend visit. At approximately 10:30 a.m., while en route, Bryant called a supervisor at DHHS to discuss the status of whether he would receive temporary full custody of the children during the pendency of the juvenile case. Bryant testified the supervisor told him she did not know the current status of the situation and would have someone contact him later.

Bryant testified that K.B. left a voicemail on his phone at 11:47 a.m. and that he did not notice the voicemail until after he had arrived at his daughter's home that afternoon. Bryant testified he did not believe there was any hurry to call K.B.

back because she simply introduced herself, asked about a conversation he had with her supervisor, and asked him to call her back. Bryant testified he tried calling K.B. back, left her a voicemail, and proceeded with his day.

According to Bryant, he did not learn about the temporary custody order until after 3 p.m. that day. Bryant testified that he was upset once he learned of the order because he had spent the week being told that there was no reason to keep his children from him and that he would receive temporary custody. He admitted that he conveyed this anger to K.B. in a phone call he initiated around 3:15 p.m.

Bryant testified he discussed with K.B. that in his experience there was "[o]verreach big time by the family courts" and the "county attorneys." He was "very vocal and voiced [his] opinions." He claimed that he did not threaten to shoot anyone or refer to bullets. But Bryant testified he told K.B. the government needs to step in and "if that's what it takes is the government to, basically. . . order the military to take them out, then maybe that's what needs to happen to start setting a new precedence for this."

Bryant explained that there were two or three calls between himself and K.B. around this time because cell phone service was "spotty" and the calls were getting dropped. Bryant testified with respect to the 3:53 p.m. call that he could not remember if, but he believed, K.B. called him back. Bryant described the call as a continuation of the conversation commenced in the prior call initiated by K.B.—because the first call got dropped due to poor cell phone reception.

With respect to what he said during the 3:53 p.m. call, Bryant admitted he said "well, maybe you deserve one too." When asked on cross-examination, "[o]ne what?" Bryant simply answered, "One." When asked what he was referring to, he stated, that was "going back into reference to the phone call that got cut off earlier. . . . The one where I indicated that maybe it would take the government ordering our military to step in and take — I mean, if that's what it took is for them to take judges or I mean . . . ."

Bryant testified that when he made these comments to K.B., he was not saying them to scare her or intimidate her, but he wanted someone to "finally kind of wake up and start listening to the other side of what's going on." Bryant testified he did not believe he was threatening anyone with crimes of violence, but admitted his statements were reckless. Bryant testified he did not intend to cause any terror, panic, or fear.

After the State's case in chief, Bryant moved for a directed verdict, arguing that the State failed to meet its evidentiary burden. The district court overruled this motion after finding that the evidence received provided sufficient factual proof for the issues to go to the jury. At the close of all evidence, Bryant renewed his motion for directed verdict. This was again overruled by the court.

The jury found Bryant guilty of terroristic threats, assault in the third degree, and intimidation by phone call. The jury acquitted Bryant of a charge of obstructing government operations. The district court sentenced Bryant to concurrent determinate terms of 18 months' imprisonment for the terroristic threats conviction, with 18 months of post-release supervision; 18 months' imprisonment for the assault in the third degree conviction; and 2 months' imprisonment for the intimidation by phone call conviction. Credit was given for 1 day served. Bryant does not challenge his sentences on appeal.

## ASSIGNMENTS OF ERROR

Bryant assigns that the district court erred in overruling his motion to dismiss the charges of terroristic threats, assault in the third degree, and intimidation by phone call on the grounds of insufficient evidence.

## STANDARD OF REVIEW

[1] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and

such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[1]

## ANALYSIS

As to each of his convictions, Bryant asserts the court erred in overruling his motion to dismiss for insufficient evidence. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.[2]

### Third Degree Assault and Terroristic Threats

We first address Bryant's assertion that the evidence was insufficient to support his convictions for terroristic threats and third degree assault.

Section 28-311.01(1) describes the crime of terroristic threats:

A person commits terroristic threats if he or she threatens to commit any crime of violence:

(a) With the intent to terrorize another;

(b) With the intent of causing the evacuation of a building, place of assembly, or facility of public transportation; or

(c) In reckless disregard of the risk of causing such terror or evacuation.

The intent to terrorize another, for purposes of the crime of terroristic threats, is an intent to produce intense fear or anxiety in another.[3] Section 28-311.01 does not require that the

---

[1] *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021).

[2] *Id.*

[3] *State v. Smith*, 267 Neb. 917, 678 N.W.2d 733 (2004).

recipient of the threat be actually terrorized, and it does not require an intent to execute the threats made.[4]

Section 28-310(1)(b) sets forth the crime of third degree assault, stating that "[a] person commits the offense of assault in the third degree if he . . . [t]hreatens another in a menacing manner." Threatening another in a menacing manner for purposes of the crime of third degree assault is a promise to do another person bodily harm which is made in such a manner as to intentionally cause a reasonable person in the position of the one threatened to suffer apprehension of being so harmed.[5]

Thus, a violation of § 28-311.01(1)(a) need not produce a result in the victim, while a violation of § 28-310(1)(b) must cause a reasonable person to suffer apprehension of being bodily harmed.[6] Section 28-311.01(1)(a) requires an intent to terrorize another and is not concerned with the result produced by an individual's threat, while § 28-310(1)(b) is violated when a person acts in a manner that intentionally causes a reasonable person in the position of the one threatened to feel apprehension of being bodily harmed.[7]

Bryant makes no specific argument that the evidence was insufficient to establish all the elements of third degree assault other than to assert that if the evidence was insufficient for the jury to conclude his statement was a terroristic threat, then it was likewise insufficient for the jury to find the requisite act of threatening in a menacing manner for purposes of third degree assault. Bryant's argument thus focuses on the crime of terroristic threats.

Bryant argues that when the threat of a crime of violence is "words only,"[8] there must be an unambiguous and specific

---

[4] *Id.*

[5] See *id.*

[6] *Id.*

[7] *Id.*

[8] Brief for appellant at 15.

threat of imminent violence against the person being spoken to before the evidence will be sufficient to establish all the elements of the crime. Bryant does not argue that § 28-311.01(1)(a) is unconstitutional, facially or as applied, and did not file a notice of an issue of constitutionality of a statute.[9] He asserts his statement to K.B. that she should consider herself next on Bryant's list for a bullet, after previously making statements to K.B. that the judge and the county attorney "deserved a bullet," was too ambiguous and of too indeterminate a timeline for performance to establish the elements of the crime of terroristic threats, given that the statement was unaccompanied by any violence or threatening gestures and was outside the context of a relationship involving past violence or threats of violence.

In several cases, we have affirmed terroristic threats convictions that were based on words alone.[10] Most apposite to the case at bar is *State v. Saltzman*.[11] Therein, we found the evidence was sufficient to support the defendant's conviction of three counts of terroristic threats based on three phone calls—one made to a protective services worker, one made to the chief of police, and one made to the ex-spouse of a witness at a prior trial for sexual assault. To the protective services worker, the defendant said, "'[Y]ou're gonna die, you bitch!'"[12] To the chief of police he said, "'[Y]ou're going to die. I'm going to blow up your house.'"[13] To the witness' ex-spouse, he said he "'was going to get my wife and kids.'"[14]

---

[9] See Neb. Ct. R. App. P. § 2-109(E) (rev. 2022).

[10] See, *State v. Saltzman*, 235 Neb. 964, 458 N.W.2d 239 (1990); *State v. Veatch*, 16 Neb. App. 50, 740 N.W.2d 817 (2007); *State v. Powers*, 10 Neb. App. 256, 634 N.W.2d 1 (2001) (*disapproved on other grounds, State v. Smith, supra* note 3; *State v. Rodriguez*, 6 Neb. App. 67, 569 N.W.2d 686 (1997).

[11] *State v. Saltzman, supra* note 10.

[12] *Id.* at 966, 458 N.W.2d at 241.

[13] *Id.* at 966, 458 N.W.2d at 242.

[14] *Id.* at 967-68, 458 N.W.2d at 242.

[2,3] We observe, first, that these threats were not necessarily of imminent violence. And the language of § 28-311.01 does not address when the crime of violence is threatened to occur. The intent of the Legislature is generally expressed by omission as well as by inclusion, and we are not at liberty to add language to the plain terms of a statute to restrict its meaning.[15] Whether or not based on "words only," § 28-311.01 does not require that the threatened crime of violence be imminent.

[4-6] Nor do we find merit to Bryant's suggestion that, in a "words only" case of terroristic threats, those words must be facially unambiguous. The threat for purposes of § 28-311.01 may be written, oral, physical, or any combination thereof.[16] We have never set forth different evidentiary burdens for different methods of threatening the victim. Whether the defendant threatens a crime of violence need not be determined solely based upon the literal meaning of the defendant's words alone. Instead, whether particular conduct constitutes a threat depends on the context of the interaction between the people involved.[17]

While Bryant and K.B. did not have a past relationship involving violence, Bryant's statements were nevertheless made in a context that was properly considered by the jury. Accepting all relevant evidence as true, giving the State the benefit of every inference reasonably drawn from the evidence, and resolving every controverted fact in its favor,[18] Bryant was "very upset" throughout the day in question and resistant to the order for his children to be taken into the custody of DHHS, which K.B. was trying to execute. After informing K.B. that he believed the judge and county attorney "deserved a bullet," Bryant told K.B. "take my [expletive] kids, consider yourself next on my list for a bullet."

---

[15] See *State v. Frederick*, 291 Neb. 243, 864 N.W.2d 681 (2015).

[16] See *State v. Duckworth*, 29 Neb. App. 27, 950 N.W.2d 650 (2020).

[17] *Id.*

[18] See *State v. Canady*, 263 Neb. 552, 641 N.W.2d 43 (2002).

It was reasonable for the jury to infer from these words and all the relevant surrounding circumstances of this interaction between Bryant and K.B. that Bryant was not simply making philosophical statements about what K.B. and the others "deserved." Competent evidence supported the jury's determination that Bryant was threatening an act of violence against K.B. if she executed the custody order in question and that he did so with either an intent to produce in K.B. an intense fear or anxiety or with a reckless disregard of the risk of causing such terror.

Bryant concedes that if his statement constituted a threat under § 28-311.01, it constituted a threat under § 28-310(1)(b). There are differences between the elements of § 28-311.01 and § 28-310(1)(b), and Bryant does not elaborate, but we find the evidence was sufficient for the jury to have found Bryant made a promise to do K.B. bodily harm, which was made in such a manner as to intentionally cause a reasonable person in the position of K.B. to suffer apprehension of being so harmed.

## Intimidation by Phone Call

Lastly, we address Bryant's argument that the evidence was insufficient to support his conviction for intimidation by phone call. Bryant asserts that the evidence did not support the elements of the crime because the phone call at issue was originally initiated by K.B. and he simply called her back to continue the conversation after the call was dropped due to poor cell phone coverage.

Section 28-1310(1)(b) provides in relevant part that

[a] person commits the offense of intimidation by telephone call or electronic communication if, with intent to intimidate, threaten, or harass an individual, the person telephones such individual or transmits an electronic communication directly to such individual, whether or not conversation or an electronic response ensues, and the person:

. . . .

. . . [t]hreatens to inflict physical or mental injury to such individual or any other person or physical injury to the property of such individual or any other person[.]

[7] Section 28-1310(1)(b), in specifying "telephones such individual," does not place a time limit on when the telephone call is made in relation to a telephone call initiated by the victim. At least one other court has rejected, under a similar statutory scheme, a reading of the verb "telephone" that would be narrower than its plain and ordinary meaning.[19] We often turn to dictionaries to ascertain a word's plain and ordinary meaning.[20] The dictionary definition of "telephone" as a verb is "to speak to or attempt to reach by telephone."[21] The plain and ordinary meaning of "telephones such individual" in § 28-1310(1)(b) does not require that the conversation be a new one. Thus, Bryant "telephone[d]" K.B.

Immediately after the connection was made by telephoning K.B., Bryant made the threat at issue. Nevertheless, Bryant argues that the jury could only reasonably infer that Bryant's intent when telephoning K.B. was to simply continue the conversation that had been dropped due to poor cell phone coverage. We disagree.

[8] The intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident.[22] And making a threat shortly after the inception of the call is usually sufficient circumstantial evidence for a jury to find that the defendant telephoned the victim with the requisite intent to intimidate, threaten, or harass.[23] Despite the

---

[19] *In re Shaneace L.*, 130 N.M. 89, 18 P.3d 330 (N.M. App. 2000) (*overruled in part, State v. Trossman*, 146 N.M. 462, 212 P.3d 350 (2009)).

[20] *State v. Gilliam*, 292 Neb. 770, 874 N.W.2d 48 (2016).

[21] "Telephone," Merriam-Webster.com, http://www.merriam-webster.com/dictionary/telephone (last visited Mar. 14, 2022).

[22] *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018).

[23] See *In re Shaneace L., supra* note 19. See, also, *State v. Saltzman, supra* note 10.

evidence of a prior dropped call, the evidence here was sufficient for the jury to infer that Bryant meant to intimidate, threaten, or harass K.B. when he telephoned her.

Bryant does not contest on appeal the other element of § 28-1310(1)(b), that he threatened to "inflict physical or mental injury to such individual or any other person or physical injury to the property of such individual or any other person" during the call in question. The fact that Bryant telephoned K.B. shortly after a call initiated by K.B. was dropped due to poor cell phone coverage does not render the evidence insufficient to establish all the elements of § 28-1310(1)(b). Accordingly, we find no merit to Bryant's argument that the evidence was insufficient to support his conviction of intimidation by phone call.

## CONCLUSION

Having found no merit to Bryant's arguments that the evidence was insufficient to support the convictions for terroristic threats, assault in the third degree, and intimidation by phone call, we affirm the judgment below.

AFFIRMED.